# In The Matter Of:

*Lauren Roberts, et al. v.*
*Trop, Inc., D/B/A Pink Pony, et al.*

---

*Teri Gale Galardi*
*March 29, 2017*

---

*American Court Reporting Company, Inc.*

*52 Executive Park South*

*Suite 5201*

*Atlanta, Georgia 30329-2217*

*(404) 892-1331 - (800) 445-2842*

Original File 75673.TXT

**Min-U-Script® with Word Index**

Case 1:17-cv-00462-WSD   Document 18-2   Filed 05/30/17   Page 2 of 37

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 3

```
LAUREN ROBERTS, LATISHA BLAKE, ASHLEY   )
BULLOCK, ASHLEY GIORDANO, THERESA GIKAS,)
and ANGELICA ANDREWS,                   )
                                        )
            Claimants,                  )
                                        )
         vs.                            )
                                        )
TROP, INC., D/B/A PINK PONY, and TERRI  )
GALARDI,                                )
                                        )
            Respondents.                )
_____)
LATOYA BECTON, LATISHA BLAKE, RODRINNA  )
BROOKS, COURTNEY HADLEY, SHELDON HAILEY,)
BRIANNA MATHIS, SASHA OMOGIATE, MIKKI   )
WILLIAMS, and BRIANNA WIGGINS,          )
                                        )
            Claimants,                  )
                                        )
         vs.                            )
                                        )
COUNTRY CLUB, INC., D/B/A GOLDRUSH, AND ) Arbitrator:
TERRI GALARDI,                          )
                                        ) George Reid
            Respondents.                )
                      - - -
```

The deposition of TERI GALE GALARDI, taken on behalf of the Claimants, taken pursuant to the stipulations contained herein, the reading and signing of the deposition being reserved; taken before Audrey Michelle Ling, Certified Court Reporter and Notary Public, commencing at 10:24 a.m., on this the 29th day of March 2017, at 2600 Peachtree Street, Suite 2700, Atlanta, Georgia.

Page 2

```
APPEARANCES OF COUNSEL:

For the Claimants:

        AINSWORTH G. DUDLEY
        Attorney at Law
        Dudley LLC
        Building One, Suite 200
        4200 Northside Parkway
        Atlanta, Georgia 30327
        Tel: (404) 687-8205
        Fax: (404) 237-2150
        E-Mail: Dudleylaw@imnisp.com

        MICHAEL LEE CHAPMAN
        Attorney at Law
        Michael L. Chapman, P.C.
        4200 Northside Parkway
        Building One, Suite 200
        Atlanta, Georgia 30327
        Tel: (404) 734-8510
        Fax: (404) 237-2150
        E-Mail: Mchapman@chapmanfirm.com

For the Respondents:

        DEAN RICHARD FUCHS
        Attorney at Law
        Schulten Ward Turner & Weiss, LLP
        260 Peachtree Street NW
        Suite 2700
        Atlanta, Georgia 30303
        Tel: (404) 688-8277
        Fax: (404) 688-6840
        E-Mail: D.fuchs@swtwlaw.com

Also Present:

        Dennis Williams
```

Page 4

## CONTENTS

### EXAMINATION

Examination by Mr. Dudley ............ 4

Examination by Mr. Fuchs ............ 101

### E X H I B I T S

No exhibits were marked for identification.

P R O C E E D I N G S

MR. DUDLEY: This is the deposition of Teri Galardi, to be used in two arbitration cases: Lauren Roberts, et al., versus TROP, Inc., et al.; and Latoya Becton, et al., versus Country Club, Inc., et al.

Swear in the witness, please.

TERI GALE GALARDI, was called as a witness and, having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. DUDLEY:

Q   Could you state your full name, please.

A   Teri Gale Galardi.

Q   Ms. Galardi, is your first name spelled T-E-R-R-I or one R?

A   One R.

Q   One R. Okay. My name is Ainsworth Dudley. I'm here with Mike Chapman, who's sitting to my right. We represent a number of former adult entertainers at Goldrush and Pink Pony. We're here to ask you some questions about those two cases. You're under oath. I think you've given depositions before, so you certainly understand what you're doing here today;

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 5

1  right?
2      A   Right.
3      Q   How many depositions have you given for an
4  adult entertainment club?
5      A   I think, two.
6      Q   Two.  And what cases were those?
7      A   I don't remember.
8      Q   Can you tell me what clubs were involved?
9      A   It was in Florida.
10     Q   Okay.  Was one of them the Geter case?
11     A   Yeah.
12     Q   Fly Low?
13     A   I think so.  Mm-hm (affirmative).
14     Q   And the other one you can't recall what club
15  was involved?
16     A   The other one was Pink Pony Doral.
17     Q   That's another Florida --
18     A   Right.
19     Q   -- case?  Okay.  Can you tell me what you do
20  for a living.
21     A   Well, I am the owner, CEO, of adult
22  entertainment establishments that I inherited from my
23  father.  I also have a small bar of my own in Fort
24  Lauderdale that I had before my father passed away.
25     Q   When did your father pass away?

Page 6

1      A   December 1st, 2012.
2      Q   And is it a fair statement to say that your
3  father owned a number of adult entertainment clubs
4  around the country?
5      A   Yes.
6      Q   And you inherited his interest in those
7  clubs?
8      A   Yes.
9      Q   Let me ask you a few questions before that.
10  You had a nightclub in Florida?  Is that what you
11  said?
12     A   A bar, a small bar.
13     Q   A bar.  Okay.  And that's not an adult
14  entertainment club; right?
15     A   No.
16     Q   Okay.  And in that club, you sold food or
17  just alcohol?
18     A   We serve just bar food.  We have a very
19  small kitchen.
20     Q   And you have waitresses and bar staff?
21     A   No.
22     Q   Those sorts of employees?
23     A   We have bartenders.
24     Q   Okay.  No waitresses?
25     A   No waitresses.

Page 7

1      Q   How many years did you run that club or bar?
2      A   I still have that club.
3      Q   When did you start it?
4      A   I believe I bought it in '08 or '9.
5      Q   And you had owned some bars before that time
6  too; right?
7      A   The Backdoor Lounge in Las Vegas.
8      Q   Okay.  Did you utilize a tip credit system
9  for your employees at those bars?
10     A   Nevada doesn't have that.
11     Q   Is it your understanding that the federal
12  law has a tip credit provision?
13         MR. FUCHS: Objection to form.  If you
14     know, you can answer.
15         THE WITNESS: All I can tell you is
16     Nevada pays full minimum wage.  So I'm not -- I'm
17     not, you know -- I'm not used to the tip credit.
18  BY MR. DUDLEY:
19     Q   Okay.  So your staff in Nevada, they're paid
20  the minimum wage --
21     A   That's right.
22     Q   -- under either state or federal law.  And
23  you do not utilize the tip credit.
24         MR. FUCHS: Objection to form.  If you
25     know, you can answer.

Page 8

1         THE WITNESS: Not that I know of.
2  BY MR. DUDLEY:
3      Q   Okay.  What about in Florida?
4      A   In Florida, I don't know if they use it or
5  not.
6      Q   But you understand the basic obligation,
7  from running these bars, that you have to pay the
8  minimum wage to your employees; correct?
9      A   I understand there's a tip wage here.
10     Q   But you understand that, regardless of
11  whether there's a tip wage or not, you're required to
12  pay the minimum wage to your employees; correct?
13  Anywhere.
14     A   Right.
15     Q   All right.  So you inherited your father's
16  interest in a number of nightclubs after he passed
17  away in December of 2012.  One of those nightclubs was
18  the Pink Pony in Atlanta; is that correct?
19     A   Right.
20     Q   And the Pink Pony is operated by TROP, Inc.;
21  is that correct?
22     A   TROP, Inc.
23     Q   TROP, Inc.?  What does TROP stand for?
24     A   My father named corporations different
25  things for different reasons.  I have no idea.

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 9

1    Q    Okay.  And are you the hundred percent owner
2  of TROP, Inc.?
3    A    Yes.
4    Q    Are you on the board of directors of TROP,
5  Inc.?
6    A    Yes.
7    Q    Are you an officer?
8    A    Yes.
9    Q    What position do you have?
10    A    President.
11    Q    Have you always been president since you
12  inherited your interest?
13    A    Yes.
14    Q    Do you hold any other offices?
15    A    I don't know.
16    Q    You don't know whether you're a --
17    A    No, I don't.
18    Q    -- treasurer --
19    A    I don't know.
20    Q    -- secretary, vice president?  Are you an
21  employee of TROP, Inc., or TROP, Inc.?  If I
22  mispronounce it, I apologize.
23    A    Do I receive a paycheck from TROP, Inc.?
24    Q    Are you an employee?
25    A    I receive a paycheck from TROP, Inc.

Page 10

1    Q    And what do you understand you receive that
2  paycheck for?
3    A    Because I own it.
4    Q    Are you rendering services to TROP, Inc.,
5  also?
6    A    I go to the office.  I check my e-mail.
7    Q    Where is the office?
8    A    It's at 2555 Chantilly Drive Northeast.
9    Q    Do you run TROP, Inc.?
10    A    No.
11    Q    Do you manage it?
12    A    No.
13    Q    Who does?
14    A    I have Dennis Williams, Mike Kap, and
15  various managers that are in the club.
16    Q    Can you tell me what Dennis Williams does
17  for TROP, Inc.?
18    A    He's the CFO.
19    Q    What does he do as CFO?
20    A    He takes care of all the licensing and
21  different -- not really operations of the club, but he
22  also has restaurant -- he has restaurants in the club.
23    Q    What do you mean, he has restaurants?  He
24  runs the restaurant?
25    A    Right.  No.  He has the restaurants in the

Page 11

1  club.
2    Q    Tell me what you mean by that.  Do you -- is
3  that --
4    A    I mean --
5    Q    Does he have his own company?
6    A    -- operate.  Yes.
7    A    He has his own company at Pink Pony that
8  operates a restaurant?
9    A    Yes.
10    Q    What's the name of that company?
11    A    I don't know.
12    Q    What else does he do at Pink Pony?
13    A    At Pink Pony?  That's all.
14    Q    Or for TROP.
15    A    That's all.
16    Q    What does Mike Kap do for TROP?
17    A    Mike Kap is the operations manager.  He
18  visits the club.
19    Q    What are his responsibilities as operations
20  manager?
21    A    Operations.
22    Q    Well, tell me what that means to you.  It
23  may not mean the same thing to you that it means to
24  me, so --
25    A    I don't -- I don't even -- I don't get

Page 12

1  involved in what he does in the clubs.  I don't know.
2    Q    Well --
3    A    I know he visits the clubs.
4    Q    Does he hire staff?
5    A    I don't know.
6    Q    You don't know anything Mike Kap does.  You
7  call him operations manager, but you don't know
8  anything he does.
9    A    He may hire managers, and then managers hire
10  other people.  I don't know.  I know he visits clubs.
11    Q    Who makes the financial decisions?
12        MR. FUCHS: Objection to form.  If you
13    understand what that question means, you can
14    answer.
15        THE WITNESS: Well, I don't know what
16    financial -- what financial decisions you're
17    talking about.
18  BY MR. DUDLEY:
19    Q    Well, you've run several bars; right?
20    A    Right.
21    Q    You've owned them, and you've run them;
22  right?
23    A    Right.
24    Q    So you know what it takes to run a bar or a
25  club?

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

**Page 13**

1    A   Right.
2    Q   You know the type of decisions, financial
3  and otherwise, that need to be made at these types of
4  places.
5    A   I don't know what kind of financial
6  decisions you're talking about.
7    Q   Well, I'm asking you. I don't either.
8    A   Can you be more specific?
9    Q   You're the one --
10   A   You're asking me the question. Can you be
11  more specific?
12   Q   I'm asking you a very simple question. And
13  that is: What does Mike Kap do as operations manager?
14   A   He doesn't make the financial decisions. We
15  have a chief financial officer who handles some of the
16  financial systems. And we have a chief operations
17  manager -- officer who does that, and that's Mike Kap,
18  operations.
19   Q   Who does the -- who is the chief financial
20  officer? Mr. Williams?
21   A   Yes.
22   Q   And you're saying he handles the financial
23  affairs?
24   A   Yes.
25   Q   Okay. I mean, that would make sense if he's

**Page 14**

1  chief financial officer, would it not?
2    A   Mm-hm (affirmative).
3    Q   Now, do you know who's under Mike Kap as
4  operations manager of TROP, Inc.? Is there a shift
5  manager or a club manager?
6    A   There is. There -- but I don't really -- I
7  mean, I know some of their first names, but --
8    Q   So you don't know the names of -- well,
9  strike that.
10       Is there a manager under Mike Kap that runs
11  Pink Pony?
12   A   You know, I think -- I don't even want to
13  say "I think." But there are shift managers under
14  Mike Kap.
15   Q   So you believe that there is a -- there is a
16  night shift manager and a day shift manager?
17   A   Right.
18   Q   And do you know their first names?
19   A   Yes.
20   Q   What are those names?
21   A   Jeff.
22   Q   He's which one?
23   A   Daytime.
24   Q   Day. Who's night?
25   A   Eddie.

**Page 15**

1    Q   Is it your understanding that Mike hires
2  entertainers or --
3    A   No. I don't know who hires them.
4    Q   You don't know. You don't know whether it's
5  Mike --
6    A   It's not.
7    Q   -- the night manager or the day shift
8  manager?
9    A   It's not Mike. It would be the managers.
10   Q   Do you also have an interest in Country
11  Club, Inc., in Georgia?
12   A   Yes.
13   Q   That is a Georgia corporation?
14   A   I don't know.
15   Q   That is, again, an interest that you
16  inherited --
17   A   Right.
18   Q   -- from your father when he passed away in
19  December of 2012 --
20   A   Yes.
21   Q   -- correct? Country Club, Inc., owns
22  Goldrush; is that correct?
23   A   Yes.
24   Q   You're a hundred percent owner of Country
25  Club, Inc.?

**Page 16**

1    A   Yes.
2    Q   You are a director?
3    A   I'm president.
4    Q   Are you a director?
5    A   I don't know.
6    Q   Well, you knew it for Pink Pony. Is there
7  any reason why you don't know who the board of
8  directors are for Country Club, Inc.?
9    A   I don't really know TROP, Inc., if it's -- I
10  just know I'm president.
11   Q   So you do not know who the directors are of
12  Country Club, Inc.?
13   A   No. I'd have to look at the corporate --
14  I'm the president. I imagine I'd be a director as
15  well. I don't look at those documents very often.
16   Q   Who keeps up with that stuff?
17   A   Dennis Williams and my secretary, Kelly.
18   Q   Are you treasurer, secretary, any other
19  officer --
20   A   I don't know.
21   Q   -- of Country Club, Inc.?
22   A   I don't know.
23   Q   Do you know who any of the other officers
24  are?
25   A   No.

**Lauren Roberts, et al. v.**
**Trop, Inc., D/B/A Pink Pony, et al.**

**Teri Gale Galardi**
**March 29, 2017**

Page 17

1   Q   Are you an employee of Country Club, Inc.?
2   A   No.
3   Q   Do you receive a salary?
4   A   No.
5   Q   Is there a particular reason why you do not
6   receive a salary there, but you do receive one at Pink
7   Pony?
8   A   Well, probably because that club doesn't
9   make a lot of money.  It would hurt the club.
10   Q   Tell me what you do as president at Country
11   Club, Inc.
12   A   Nothing.  Nothing, really.
13   Q   You have no responsibilities?
14   A   Not really.
15   Q   Is it a fair statement to say that you have
16   the ultimate decision-making authority when it comes
17   to Goldrush?
18   A   It would depend on the decision.
19   Q   Well, tell me the types of decisions that
20   you would have ultimate authority on.
21   A   To sell it or not to sell it.
22   Q   Is that it?
23   A   That's it.
24   Q   I'm not asking you whether you -- whether
25   you exercise authority.  I'm asking whether you have

Page 18

1   it. You're a hundred percent owner.  You're the
2   president.
3   A   I don't involve myself with any operations
4   in any club.
5   Q   Do you have the authority to make any
6   decision?  Let me rephrase that.
7       Do you have the authority to make every
8   decision for Country Club, Inc., if you so choose to?
9   A   That's not something I would do.
10   Q   I'm not asking you that.
11   A   I understand what you're asking me.  But
12   you're asking me to tell me something that I wouldn't
13   do.
14   Q   Okay.  Well, what I'm asking you is whether
15   you have the power to do that, not whether you would
16   do it.
17   A   As owner, I would have the power.  But it's
18   not something that I would do.  I don't know -- I
19   don't deal with those businesses.  I don't know about
20   those businesses.  So I would not go around throwing
21   my authority around in those businesses.  I would only
22   make the decision of whether to sell it or not.
23   Q   Who do you let make the other decisions for
24   Country Club, Inc.?
25   A   Mike Kap.

Page 19

1   Q   Who else?
2   A   Dennis Williams.
3   Q   And is Mike the operations manager at
4   Country Club, Inc.?
5   A   Yes.
6   Q   Does he have any other responsibilities?
7   A   No.
8   Q   And Mr. Williams is the financial officer?
9   A   Right.
10   Q   Does he have any other responsibilities at
11   Country Club, Inc.?
12   A   No.
13   Q   Do you have an interest in a company called
14   Pony Tail, Inc.?
15       MR. FUCHS: I'm going to object to the
16   form of the question.  This case does not involve
17   Pony Tail, Inc.  So I'm going to give you a
18   little bit of latitude here.  But if you stray
19   too far, I'm going -- I'm going to instruct the
20   witness not to answer.
21       You can answer that question.
22       MR. DUDLEY: Well, you can object to
23   the form of the question.  But, otherwise, I
24   think it's an inappropriate objection, but --
25       MR. FUCHS: That's fine.

Page 20

1   BY MR. DUDLEY:
2   Q   Do you have an interest in Pony Tail, Inc.?
3   A   I don't know, honestly.  I don't know if I'm
4   on as a -- as a president or not.  I don't know.
5   Q   Do you own Pony Tail, Inc.?
6   A   I own Pony Tail, Inc.
7   Q   A hundred percent of it?
8   A   Yes.
9   Q   And you're a director at Pony Tail, Inc.?
10   A   I don't know.
11   Q   You don't know if you're a director?
12   A   No.
13   Q   Can you think of any reason why you would be
14   treated differently at Pony Tail, Inc., than you are
15   at TROP, Inc., or --
16   A   I don't go --
17   Q   -- Country Club --
18   A   I don't go into the clubs, so it wouldn't
19   treat me any kind of way.
20   Q   You're a president of Pony Tail, Inc.?
21   A   I believe so.
22   Q   Are you an employee?
23       MR. FUCHS: Okay.  I'm going to place
24   an objection on the record.  Ainsworth, I need to
25   understand, before we continue down this path,

Case 1:17-cv-00462-WSD   Document 18-2   Filed 05/30/17   Page 7 of 37

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 21

1   why you are asking Ms. Galardi about entities
2   that are not involved or affiliated with this --
3   the claims that you've asserted.
4          MR. DUDLEY: It's my deposition.
5          MR. FUCHS: Yes.  That's correct.  But
6   if you can't answer my question, I'm going to
7   tell her not to answer.
8          MR. DUDLEY: Okay.  Well, I'm certainly
9   entitled, in a deposition, to get into what her
10  relationship is in Pony Tail, Inc.
11         MR. FUCHS: Because?
12         MR. DUDLEY: Because they have been
13  sued in the exact same type of case we've been
14  sued here -- that's present here.  And I'm going
15  to get into that today, unless you instruct her
16  not to answer it.
17         MR. FUCHS: Well, that's what's coming.
18         MR. DUDLEY: Well, that's fine.  I'm
19  not going to spend a lot of time on this, but I
20  need to understand her basic relationship with
21  Pony Tail, Inc.
22         MR. FUCHS: And she's told you.
23  BY MR. DUDLEY:
24   Q   So you are -- you don't know whether you're
25  a director, you own a hundred percent of it, and

Page 22

1   you're the president; is that correct?
2    A   That's correct.
3    Q   And are you an employee?
4    A   No.
5    Q   Do you own a company called Country Club,
6   Inc., in South Carolina?
7          MR. FUCHS: I'm going to object.  I'm
8    going to object.  You're getting too far afield
9    of this case.  I'm going to instruct Ms. Galardi
10   not to answer the question.
11  BY MR. DUDLEY:
12   Q   All right.  Are you a director of Country
13  Club, Inc.?
14         MR. FUCHS: Which one are we talking
15   about now?
16         MR. DUDLEY: Same one.
17         MR. FUCHS: South Carolina?
18         MR. DUDLEY: Yeah.
19         MR. FUCHS: Don't answer that question.
20  BY MR. DUDLEY:
21   Q   Are you an officer of Country Club, Inc.?
22         MR. FUCHS: I direct you not to answer
23   that question.
24  BY MR. DUDLEY:
25   Q   Are you an employee of Country Club, Inc.,

Page 23

1   South Carolina?
2          MR. FUCHS: Same objection.  When you
3   decide you want to ask questions about --
4          MR. DUDLEY: Dean, I'm going to ask
5   questions.  If you want to object, all I can do
6   is -- if you want to instruct her not to answer
7   it, that's your right.  We'll deal with it later.
8          MR. FUCHS: That's fine.  And I'm just
9   telling you that I'm going to direct her not to
10  answer.  But if you've got questions about the
11  clubs that are at issue in this case, the
12  companies that are at issue, that's fine.
13         MR. DUDLEY: Depositions are not
14  limited to what you would like to testify to.
15  You know, we have taken the claimants'
16  depositions in this case, and you have had wide
17  latitude, asking them about where they've worked,
18  things like that.  It's the same situation here.
19  If you want to instruct her not, we'll take it up
20  with George.
21         MR. FUCHS: That's fine.
22  BY MR. DUDLEY:
23   Q   Do you have an interest in any other adult
24  entertainment clubs other than the ones we've just
25  talked about?

Page 24

1          MR. FUCHS: You can answer.
2          THE WITNESS: I do.
3   BY MR. DUDLEY:
4    Q   Which ones?
5          THE WITNESS: Do you want me to answer
6    that?
7          MR. FUCHS: Yes, you can answer.
8    That's okay.
9          THE WITNESS: Can you be more specific?
10  BY MR. DUDLEY:
11   Q   Do you -- you know what an adult
12  entertainment club is?
13   A   I do know what an adult entertainment club
14  is.
15   Q   Okay.  Do you have an interest in one?
16   A   In Georgia?
17   Q   Other than the ones you've talked about.
18   A   In Georgia?
19   Q   Anywhere.  Anywhere in the world.
20   A   Cheetahs Las Vegas, Pink Pony Doral.  You
21  just want the adult entertainment?
22   Q   Yes.
23   A   Onyx.
24   Q   Is there an Onyx other than the Pony Tail,
25  Inc., one?

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 25

1    A   No.
2    Q   Okay.
3    A   Masters South Carolina.
4    Q   That's Country Club, Inc., South Carolina?
5    A   Correct.
6    Q   All right.  What else?
7    A   That's it, I think, for adult entertainment.
8    Q   Those are the ones you have a current
9    interest in?
10   A   Correct.
11   Q   Are there ones that you inherited from your
12   father --
13   A   Those, I inherited.
14   Q   I understand that.  Let me ask my question.
15       Are there other clubs that you inherited
16   from your father that you no longer have an interest
17   in?
18   A   That I've sold?
19   Q   That would be one way of divesting your
20   interest.
21   A   I have sold.
22   Q   Which ones have you sold?
23   A   I sold King of Diamonds in Miami.  I sold
24   Pink Pony in Pompano.  And I think -- I think that's
25   it.

Page 26

1    Q   These are clubs that -- well, strike that.
2    When did you sell King of Diamonds in Miami?
3    A   2013, I believe.  No.  2014, I think.
4    Q   2014?
5    A   I think so.
6    Q   All right.  When did you sell the Pink Pony
7    in Pompano?
8    A   2016.
9    Q   Without getting into the ones you still
10   own -- the Cheetah Las Vegas, Pink Pony Doral -- is it
11   safe to say that you have a similar type arrangement
12   with those companies that you have with Country Club,
13   Inc., of Georgia and TROP, Inc., here, so far as being
14   an owner, hundred percent owner, possibly a director
15   and officer?
16   A   Yes.  Yes.
17   Q   And is that the same --
18   A   I don't think I'm an officer in Doral, but I
19   own it.
20   Q   And the ones you sold, KOD in Miami and Pink
21   Pony in Pompano, you were a hundred percent owner of
22   those and possibly an officer -- I'm sorry -- possibly
23   a director and an officer of those; correct?
24   A   Correct.
25   Q   When you inherited your interest in these

Page 27

1    adult entertainment clubs we've been talking about,
2    there was a wage and hour case that had been filed
3    against Onyx; correct?
4    A   Correct.
5    Q   All right.  And you were --
6    A   Not when I inherited them.  I'm sorry.
7    That's not true.  I think it was before that.  My
8    father was alive.
9    Q   When you inherited your interest in these
10   adult entertainment clubs we have been talking about,
11   there was a claim for wage and hour violation existing
12   at the time; correct?
13           MR. FUCHS: Objection to form.  If you
14       know what he's talking about, you can answer.
15           THE WITNESS: No.  I don't know what
16       you're talking about.
17   BY MR. DUDLEY:
18   Q   Okay.  You know the lawsuit I'm talking
19   about; correct?
20   A   I don't know what you're talking about,
21   which one you're talking about.
22   Q   Okay.  When you inherited your interest in
23   Pony Tail, Inc., was there a lawsuit out there brought
24   by a young woman named Clincy?
25   A   I don't know.

Page 28

1    Q   You don't know whether the lawsuit existed?
2    A   No.
3    Q   You never heard of that?
4    A   No.
5    Q   You didn't have a discussion with Dennis
6    Williams when you inherited your interest about the
7    status of that lawsuit?
8    A   I don't know which lawsuit you're talking
9    about.  I know there was one that we were paying a
10   settlement on.
11   Q   Okay.
12   A   I don't know.  I don't know which one you're
13   talking about.
14   Q   You testified that your father died in
15   January of 2012.
16   A   That's right.
17   Q   And --
18           MR. FUCHS: Objection.  I think it was
19       December of 2012.
20           MR. DUDLEY: I'm sorry.
21   BY MR. DUDLEY:
22   Q   Was it December --
23   A   Oh, you said January?
24   Q   I'm sorry.
25   A   Yeah.  December.

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 29

1    Q    December of 2012?  Okay.  And you're saying
2  that you understood the lawsuit had been settled
3  before -- before his --
4    A    I don't -- I don't know which lawsuit you're
5  talking about.  I know there was one that was settled.
6    Q    That's the one I'm talking about --
7    A    Okay.
8    Q    -- the one you know about.
9    A    Well, then it wasn't -- it was settled.  It
10  wasn't an ongoing lawsuit.
11    Q    Okay.  When you inherited your interest, you
12  were told by Dennis that a wage and hour case had been
13  settled; correct?
14    A    Correct.
15    Q    All right.  And you understood that that was
16  a lawsuit brought by former or then entertainers of
17  the Onyx; correct?
18    A    Yes.
19    Q    And you were told that that case had been
20  settled.
21    A    Correct.
22    Q    Now, were you aware of that lawsuit before
23  you inherited your interest?
24    A    Yes.
25    Q    And how were you aware of it?

Page 30

1    A    Just my father.
2    Q    What did your father tell you about it?
3    A    Just that there was a lawsuit.
4    Q    All right.  But you understood it was
5  because the entertainers in that case were claiming
6  that they were misclassified as independent
7  contractors.
8    A    I don't know what they were claiming.
9    Q    You don't know whether they were claiming
10  that they were misclassified as independent
11  contractors?
12    A    No, I don't.
13    Q    And you were --
14    A    I didn't read it.
15    Q    You were aware that they were claiming they
16  were owed minimum wage; correct?
17        MR. FUCHS: Objection.  I think she
18     just said she doesn't know what they were
19     claiming.
20  BY MR. DUDLEY:
21    Q    Well, you said you talked to your dad about
22  it.
23    A    I did not say that, only that he said there
24  was a lawsuit.  I didn't go into discussions with him
25  about his affairs.

Page 31

1    Q    But once you inherited your interest in it
2  and you realized that the club was paying out
3  1.5 million or whatever it was to the claimants in the
4  case, you had a discussion with Dennis Williams about
5  that; right?
6    A    No.  Those were already set.  And I didn't
7  have to have a discussion with Dennis Williams about
8  that lawsuit.
9    Q    Okay.  So what did you discuss with Dennis
10  Williams about that lawsuit?
11    A    Nothing.
12    Q    You discussed nothing with him.
13    A    It was already --
14    Q    Has that been your testimony in prior
15  depositions?
16    A    It was already -- I don't know.  I don't
17  remember.  I don't -- I don't remember ever having a
18  conversation with Dennis about the Onyx lawsuit.
19  Those were already in place.  And the payments were
20  already set up by Christian.  I don't remember.
21    Q    Did you give a deposition in the Geter
22  versus Galardi South Enterprises, Inc., case on or
23  about March the 25th, 2015?
24    A    I don't know the date.  But if that's what
25  it says, I'm sure that that's what happened.

Page 32

1    Q    Harlan Miller was the attorney in that case.
2  Do you remember him examining you?
3    A    Yes, I do.
4    Q    Do you remember him asking you:  So soon
5  after you took over, you learned that there had been
6  this lawsuit and it was against the club Onyx?
7    A    Right.
8    Q    And you said, "Right."  That was your answer
9  then.
10    A    Okay.
11    Q    Is that correct?
12    A    Yes.
13    Q    All right.  And then he asked you:  And it
14  had been settled; is that right?
15    A    Right.  That's just what I told you.
16    Q    And you said "right" again.
17    A    That's right.
18    Q    And that case was settled sometime in 2011.
19  Does that sound right to you?
20    A    I have no idea.
21    Q    Well, you said, "Yeah."
22    A    Well, I guess it was.
23    Q    "Before my father died," was your answer.
24    A    It was before he died, so --
25    Q    Was that true when you said it?

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 33

1    A   I guess.
2    Q   Okay.  So did Mr. Williams try to bring you
3    up to speed on what these lawsuits were about?  Your
4    answer was "yes."  Did you say that?
5    A   He brought me up to speed on what we owed.
6    And we didn't have any --
7    Q   Did you answer "yes" to that question?
8    A   I don't know.  I don't know.  I don't
9    remember.
10   Q   And then Mr. Miller asked you:  What did he
11   tell you?
12       And you said:  Well, he basically told me
13   that they were wage and hourly and there was a dispute
14   over independent contract or employee, that type of
15   thing.
16   A   Okay.
17   Q   Did you say that?
18   A   I guess I did if it says I did.
19   Q   And you understood that the essence of the
20   suit was that the entertainers claimed that they
21   should be treated as employees and paid a minimum
22   wage.  The club had treated them as independent
23   contractors and had not paid them wages, per se; is
24   that right?
25   A   Well, I didn't say all that.

Page 34

1    Q   That was his question to you.
2    A   Oh, okay.
3    Q   And you said:  If they wanted to be treated
4    as employees, they would have been treated as
5    employees.
6    A   That's correct.
7    Q   They don't want to be treated.  They are
8    professional entertainers, was your answer.
9    A   That's right.
10   Q   Sounds like to me you understood what the
11   dispute was about, did you not?
12   A   Well, I understand that if they want to be
13   treated as employees, they would be treated as
14   employees.
15   Q   I understand that is your opinion.  But you
16   understood what the dispute was --
17   A   That was --
18   Q   -- at the time.
19   A   -- the answer to my question.
20   Q   And you understood what --
21   A   That was the answer to my question.
22   Q   And you understood what the dispute was at
23   that time; right?
24   A   That was the answer to my question.
25   Q   Okay.  And you had also understood, from

Page 35

1    your discussion with Mr. Williams, that the Court had
2    made an adverse ruling as to Onyx on the issue of
3    whether the dancers were independent contractors or
4    employees; correct?
5    A   I don't know what the Court said.
6    Q   Do you want to go through this exercise
7    again?
8    A   Whatever I said, I said.  I just -- you
9    know, there's -- I don't know what the Court said.  I
10   didn't read the document.  If Dennis told me that and
11   I said it, I guess Dennis told me that.
12   Q   Did Dennis tell you that?
13   A   I don't remember.  That was a long time ago.
14   Q   Let me read you what Mr. Miller asked you.
15   A   Okay.
16   Q   So then when you came into your position of
17   CEO after your father's death, you knew that there had
18   been an adverse ruling on the independent contractor
19   issue with regards to one of the clubs in Atlanta; is
20   that right?
21       And your response was "right."
22       Now, was that true when you responded?
23   A   If that's how I responded.  I don't
24   remember.  I don't remember all of these.
25   Q   When you gave this testimony under oath, did

Page 36

1    you tell the truth?
2    A   I'm sure I did.
3    Q   Okay.  And if that wasn't clear enough, he
4    then asked you:  You knew when you took over as CEO
5    that there had been an adverse ruling with respect to
6    one of the clubs in Atlanta; is that right?
7    A   I already --
8    Q   Your answer, "yes."
9    A   -- told you, yes.
10   Q   Do you know whether Mr. Fuchs represented
11   your father and Pony Tail, Inc., in that case?
12   A   I don't know.
13   Q   Do you know whether Mr. Fuchs gave legal
14   advice to your father about --
15   A   I don't know.
16   Q   Let me finish the question -- about the
17   Clincy litigation?
18   A   I don't know.
19   Q   To your knowledge, did Mr. Fuchs give legal
20   advice to you or Pony Tail, Inc., about the Clincy
21   decision?
22   A   Not to me.
23   Q   Everything you know about -- everything you
24   know about Clincy came from Mr. Williams?
25   A   Yes.

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

---

Page 37

1    Q   Are you aware of a lawsuit that was brought
2  by an entertainer named -- last name Lemon against
3  Galardi South Enterprises for another wage and hour
4  violation in September of 2013?
5    A   No.  I don't -- that doesn't sound familiar.
6    Q   But at that time you were an officer and
7  owner of Pony Tail, Inc; Country Club, Inc., in
8  Georgia; and --
9    A   Doesn't sound familiar.
10   Q   -- and TROP, Inc.; correct?
11   A   What time -- what year was it?
12   Q   The lawsuit was brought in September the
13  19th, 2013.
14   A   I don't remember.  September?  I don't know.
15   Q   September 19th --
16   A   I don't know what that is.
17   Q   -- 2013.
18   A   I don't know what it is.
19   Q   It was brought against Galardi South
20  Enterprises Consulting, Inc.
21       Do you know what that company is?
22   A   It must not -- it doesn't really do
23  anything, I don't think.  There's no --
24   Q   Do you own that company?
25   A   There's no employees.

---

Page 38

1    Q   Do you own that company?
2    A   Galardi South Consulting -- Galardi South is
3  just a name that we answer the phone with.
4    Q   Do you own Galardi --
5    A   I don't know.
6    Q   Let me finish my question.  We're going to
7  be here a very long time.  I know you want to
8  anticipate my question.  But, first of all, she's got
9  to hear the question.
10   A   That's fine.  I apologize.
11   Q   Do you own Galardi South Enterprises
12  Consulting, Inc.?
13   A   I don't know.
14   Q   You do not know whether you own it?
15   A   No.
16   Q   Are you an officer --
17   A   I can't --
18   Q   -- of that company?
19   A   I'm not sure.
20   Q   Do you know what that company does?
21   A   No.
22   Q   Would it be safe to say that that, perhaps,
23  is some company affiliated with your father?
24   A   I don't know.  He may have created it.  I
25  don't know.

---

Page 39

1    Q   Did you inherit an interest in that company?
2    A   That company doesn't own anything.  It
3  doesn't do anything, so I don't know.  I've never seen
4  it on anything, so I don't know.
5    Q   Ms. Galardi, I will submit to you that this
6  is not the first time somebody has asked you about
7  that company.
8    A   Okay.  I know that the company exists.  Do I
9  know who's on the documents?  I don't.  I can't recall
10  who's on those documents.  I know it exists.
11   Q   Are you aware that Dean Fuchs, William
12  Schulten, and Susan Murphey represented Galardi South
13  Enterprises Consulting, Inc., in that case?
14   A   No.  I don't know.  I'm telling you I don't
15  remember.  Okay?  I don't remember that case.
16   Q   Do you -- I'm not asking you about the case.
17  I'm asking you about Galardi South Enterprises
18  Consulting, Inc., which you -- which you have been --
19   A   Well, you're asking me --
20   Q   -- asked about repeatedly.
21   A   -- about a case of some Lemon against
22  Galardi South Consulting.  Isn't that what you're
23  asking me about?
24   Q   Do you understand that case was against
25  Goldrush?

---

Page 40

1    A   I don't know.
2    Q   As the owner of Goldrush, would you be
3  notified of a wage and hour case that was brought
4  against the company?
5    A   Probably.  I just don't remember.
6    Q   Do you know whether you were given advice or
7  Galardi South Enterprises Consulting was given advice
8  about this matter?
9    A   I don't know.  I don't remember that case,
10  so I don't know.  I'm saying I don't remember.  I
11  don't remember.
12   Q   After you had had your conversation with
13  Mr. Williams about the Clincy case, did you take any
14  acts to change the way the wage and hour policies were
15  done at Onyx or any other club in which you had an
16  interest?
17       MR. FUCHS:  Objection to form.  If you
18   understand, you can answer.
19       THE WITNESS:  Our employees are treated
20   as employees.  Our entertainers are entertainers.
21   I don't get involved in that, so I don't know.
22  BY MR. DUDLEY:
23   Q   After you were -- after you were informed of
24  the Clincy decision, did you take any action to
25  classify entertainers as employees rather than

---

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 41

1 independent contractors?
2    A   No.  I wouldn't get involved in stuff like
3 that.
4    Q   Did you undertake any acts to determine
5 whether any of these clubs we're talking about were
6 compliant with the FLSA?
7    A   We comply with the FLSA.
8    Q   I know you think you do.  But did you --
9    A   Okay.  Well --
10   Q   -- make any changes?
11   A   -- I think we do.
12   Q   Okay.  You think you do.
13   A   I think we do.
14   Q   Even though Judge Story told you you didn't,
15 you still think you do.
16   A   Yes.
17       MR. FUCHS: Objection. Form.
18 BY MR. DUDLEY:
19   Q   All right.  I'll ask you the question again.
20       Did you take any action, after you were
21 informed of the Clincy case from Mr. Williams, to make
22 sure that any of the clubs you have an interest in
23 complied with the FLSA as it pertains to entertainers?
24       MR. FUCHS: Objection to form.  I think
25    she just answered that.

Page 42

1        But you can answer it again.
2        THE WITNESS: I'm not answering it
3 again.
4        MR. DUDLEY: Read back the question,
5 please, and the prior one.
6        (Discussion off the record.)
7        (The record was read by the reporter as
8 follows:
9        "Q   Did you undertake any acts to
10    determine whether any of these clubs we're
11    talking about were compliant with the FLSA?
12    "A   We comply with the FLSA.")
13 BY MR. DUDLEY:
14   Q   Could you please answer that question.
15   A   I did.
16   Q   No, you didn't.
17   A   Yes, I did.
18   Q   After your meeting --
19   A   We comply with the FLSA where we're required
20 to comply with the FLSA.
21       MR. DUDLEY: Okay.  Go back to my final
22 question.
23       (The record was read by the reporter as
24 follows:
25    "Q   All right.  I'll ask you the question

Page 43

1 again.  Did you take any action, after you were
2 informed of the Clincy case from Mr. Williams,
3 to make sure that any of the clubs you have an
4 interest in complied with the FLSA as it
5 pertains to entertainers?")
6        THE WITNESS: Not my job.
7        MR. DUDLEY: Again, you're not
8 answering the question.  I'm objecting to the --
9        THE WITNESS: Because it's not --
10       MR. DUDLEY: You're not responding to
11 the question.
12       THE WITNESS: I'm telling you.
13       MR. DUDLEY: Could you please read the
14 question to her once more.
15       THE WITNESS: You want me to answer yes
16 or no to something that is not in my realm of job
17 duties.  I don't have those kinds -- we comply.
18 We follow the law.
19       MR. DUDLEY: Again, I object to the
20 nonresponsiveness of your answer.
21       THE WITNESS: Okay.
22       MR. DUDLEY: Could you please read that
23 back to her one more time.
24       THE WITNESS: You want a yes or no
25 answer, and it's just not a yes or no thing.

Page 44

1        MR. DUDLEY: Could you please read that
2 back to her one more time.
3        (The record was read by the reporter as
4 follows:
5    "Q   All right.  I'll ask you the question
6 again.  Did you take any action, after you were
7 informed of the Clincy case from Mr. Williams,
8 to make sure that any of the clubs you have an
9 interest in complied with the FLSA as it
10 pertains to entertainers?")
11       THE WITNESS: I didn't have any
12 conversations with Dennis Williams about the
13 entertainers in that case.
14 BY MR. DUDLEY:
15   Q   What acts, Mrs. Galardi, have you
16 undertaken, after you inherited your interest in these
17 adult entertainment clubs, to make sure they complied
18 with the FLSA as to entertainers?
19   A   I don't deal with the entertainers.
20       MR. DUDLEY: Read the question again.
21       THE WITNESS: I understand the
22 question.  It's not something that I would do.
23 And I'm here as Teri Galardi personally; right?
24       MR. DUDLEY: I'm not here to advise
25 you.  You'll have to talk to your attorney about

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 45

1 that. Could you please read that question back.
2       THE WITNESS: I'm here as Teri Galardi?
3       MR. FUCHS: Just do the best you can to
4 try to answer his question. I think you've
5 answered it. That's my opinion. Obviously,
6 Mr. Dudley disagrees.
7       MR. DUDLEY: I very much disagree. And
8 it's on the record.
9       MR. FUCHS: So I don't know how long
10 you want to go around and around.
11       MR. DUDLEY: I'm going to do it until I
12 get an answer.
13       MR. FUCHS: Well, I think she's doing
14 the best she can.
15       MR. DUDLEY: We're going to do this the
16 right way. And I'm going to ask --
17       MR. FUCHS: And, of course, that's your
18 way.
19       MR. DUDLEY: No.
20       THE WITNESS: You want -- but you want
21 me to be truthful.
22       MR. DUDLEY: Of course, I want to you
23 to be truthful.
24       THE WITNESS: I've sworn an oath to be
25 truthful.

Page 46

1       MR. DUDLEY: Read the question back,
2 please.
3       (The record was read by the reporter as
4 follows:
5       "Q   What acts --")
6       THE WITNESS: We comply with the FLSA.
7       MR. DUDLEY: Read the question back
8 again, please.
9       THE WITNESS: Go ahead. You can keep
10 reading it all you want to, but that's how I'm
11 going the answer the question.
12       MR. DUDLEY: Well, we're going to be
13 here a very long time.
14       THE WITNESS: Okay. If you want me to
15 answer in some way that I don't agree with, then
16 we're going to be here a long time, because I'm
17 not going to do it.
18       MR. DUDLEY: You haven't answered the
19 question after all --
20       THE WITNESS: I did answer the
21 question.
22       MR. DUDLEY: I'm not here to argue with
23 you. I'm here to ask questions, and it's your --
24       THE WITNESS: I answered the question.
25       MR. DUDLEY: I'm going to get an answer

Page 47

1 to the question.
2       THE WITNESS: I answered it.
3       MR. DUDLEY: Somebody's either going to
4 force you to answer it, the arbitrator. You're
5 going to answer it. You're in a legal proceeding
6 here.
7       THE WITNESS: I answered it.
8       MR. DUDLEY: It's an appropriate
9 question, and I'm going to expect a truthful
10 response.
11       THE WITNESS: That was a truthful
12 response.
13       MR. DUDLEY: Read back the question
14 again, please.
15       THE WITNESS: Is there a different way
16 you want me to answer his question?
17       MR. FUCHS: I can't --
18       THE COURT REPORTER: I can't read back
19 and write.
20       MR. FUCHS: I can't tell you how to
21 answer. All I can tell you is to listen the best
22 you can to his question and answer to the best of
23 your ability. He's asking you -- I think he's
24 asking you what acts you took.
25       MR. DUDLEY: Read it back. It's very

Page 48

1 particular.
2       MR. FUCHS: I'm trying to help her
3 here. I think he's asking you what acts, if any,
4 you took in response, I guess, to learning about
5 the Pony Tail case, the Onyx case. And your
6 answer has been "we've complied." I think he's
7 looking for any specific acts that you can recall
8 taking, if any, in response.
9       THE WITNESS: I don't recall taking any
10 acts.
11       MR. DUDLEY: Thank you.
12       MR. FUCHS: Can we take a break,
13 Ainsworth?
14       MR. DUDLEY: Yes.
15       (Brief pause in the proceedings.)
16 BY MR. DUDLEY:
17    Q   All right. Ms. Galardi, are you aware of a
18 lawsuit that was filed by Sametha Glen against Galardi
19 South Enterprises, Inc.; Pony Tail, Inc.; Galardi
20 South Enterprises Consulting, Inc.; and you
21 personally, November the 6th, 2013?
22    A   Yes.
23    Q   And that was another wage and hour case like
24 the one before the arbitrator today; correct?
25    A   Yes.

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 49

1    Q    In that case, the claimant -- and you have a
2  plaintiff and whoever else joined it -- was alleging
3  that they were denied the minimum wage, that they were
4  misclassified as an independent contractor, and that
5  they were owed wages under the FLSA; correct?
6    A    Yes.  I don't remember every detail, but I
7  know it was a wage and hourly.
8    Q    Dean Fuchs, Stephen Whitfield Brown, William
9  Scott Schulten, Abby Grozine, and Susan Murphey
10 represented you in that matter?
11   A    Yes.
12   Q    Did they give you legal advice in that case?
13   A    I don't remember.
14   Q    You don't remember whether you got any legal
15 advice?
16   A    I'm sure I did.  I just -- I don't remember
17 what --
18   Q    I'm not asking -- I don't want you to tell
19 me what you got.  I just want to know whether you
20 sought legal advice and whether you received it.
21   A    I didn't get any advice, I don't think.
22   Q    Why did you hire these -- one, two, three,
23 four -- five attorneys to represent you?
24   A    Because they're our attorneys that represent
25 us.  This relationship has been long before me, so --

Page 50

1    Q    After this Glen case was filed against you
2  and these entities, did you undertake any acts to make
3  sure these clubs were complying with the FLSA?
4    A    Can you be more specific?
5    Q    No, I can't.
6         MR. DUDLEY:  Can you read that back,
7    please.
8         THE WITNESS:  I don't recall taking any
9    acts.
10        MR. FUCHS:  She's trying to answer your
11   question.
12        MR. DUDLEY:  Okay.
13        THE WITNESS:  I don't recall taking any
14   acts.  I feel we are compliant with the FLSA.
15 BY MR. DUDLEY:
16   Q    Okay.  Do you know whether anyone else on
17 your behalf or on behalf any of these other entities
18 took any acts to --
19   A    I don't know.
20   Q    You're aware of a lawsuit brought by a
21 Mrs. Gardner, who is a former entertainer of Country
22 Club, Inc., in South Carolina, which was operating as
23 Masters, filing an FLSA claim on December the 5th,
24 2013, are you not?
25   A    I know the name.  I've heard of the case.

Page 51

1    Yes.
2    Q    You're aware of the -- aware of the case.
3    A    Mm-hm (affirmative).
4    Q    And that was against Galardi South
5  Enterprises Consulting, Inc., and Country Club, Inc.;
6  right?
7    A    I'm not sure who all was listed in that,
8  but --
9    Q    Again, you don't know anything about the
10 Galardi South Enterprises Consulting, Inc., company?
11   A    They pull those names out.  They are --
12 they're meaningless.  They don't -- they're -- it's
13 just a -- they pull whatever names they can find
14 connected to anything.  It doesn't really do anything.
15   Q    Okay.  Country Club, Inc., doing business as
16 Masters Gentleman's Club, they do something; right?
17   A    Yes.
18   Q    They operate the --
19   A    Right.
20   Q    -- club that you own in South Carolina?
21   A    Right.
22   Q    All right.  And in that case, they hired
23 Trenton H. Chambers, Dean Fuchs, Susan Murphey -- and
24 Susan Murphey to represent you in that case; correct?
25   A    Yes.

Page 52

1    Q    All right.  Did they advise you about the
2  FLSA and the classification of these workers?
3         MR. FUCHS:  I'm going to make an
4    objection.  I don't want you to discuss any
5    substance of any legal advice that may or may not
6    have been given to you.  I think he's asking a
7    yes or no question, whether advice was given to
8    you.
9         THE WITNESS:  Okay.
10        MR. FUCHS:  You can answer that.
11        THE WITNESS:  Yes.
12 BY MR. DUDLEY:
13   Q    Yes, advice was given?
14   A    On -- on which one are you talking about
15 now?
16        MR. FUCHS:  Masters club.
17 BY MR. DUDLEY:
18   Q    The Gardner, Country Club, Inc., case.
19   A    Actually, no, on that one.  No.
20   Q    You received --
21   A    I --
22   Q    -- advice, but --
23   A    I didn't talk to them about that case.
24   Q    All right.  Is it your understanding that
25 Galardi South Enterprises Consulting, Inc., and

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 53

1  Country Club, Inc., retained these attorneys for the
2  purpose of defending that lawsuit?
3      A   Yes.
4      Q   Is it your understanding that these
5  attorneys gave Country Club, Inc., advice about this
6  lawsuit?
7      A   Yes.
8      Q   You just don't know who that advice was
9  given to.  Is that what you're saying?
10     A   That's correct.
11     Q   Let me ask you about that, since we're going
12 to be going through a number of these.
13         Who on behalf of the entities we've talked
14 about so far, who is handling the communications with
15 the attorney?  When I say "handling," I mean who is
16 communicating with the attorneys about the issues in
17 these lawsuits?
18     A   Dennis Williams.
19     Q   Anyone else?
20     A   In South Carolina, Mike Kap, possibly.
21     Q   Okay.  And what sort of role have you played
22 in the ones we've talked about?
23     A   None.
24     Q   You've delegated that authority to them to
25 deal with?

Page 54

1      A   That's correct.
2      Q   Do you know whether there was an adverse
3  ruling by the District Court in South Carolina about
4  the classification issue?
5      A   No, I don't.
6      Q   So you were not advised by any attorneys
7  that there had been an adverse ruling?
8      A   No.
9          MR. FUCHS: Objection.  Don't answer
10     that question.  It goes to substance.
11 BY MR. DUDLEY:
12     Q   Presumably, that would be something that
13 would be discussed with Mr. Williams or Mr. Kap; is
14 that correct?
15     A   Correct.
16     Q   Do you know whether anybody on behalf of you
17 or Country Club, Inc., or Galardi South Enterprises
18 Consulting, Inc., took any actions after the Gardner
19 case was filed to make sure that Country Club, Inc.,
20 operating as Masters, complied with the FLSA?
21     A   Me, personally?  I don't know.  I didn't.
22 No.  I don't know about what they did.  I can't answer
23 that.
24     Q   Who is responsible for making sure that any
25 of the clubs, adult entertainment clubs, you own are

Page 55

1  in compliance with the FLSA?
2      A   Who is responsible for making sure that
3  everyone is in compliance?
4      Q   Your clubs.
5      A   Well, it would be our operations.  Would be
6  managers, would be Mike Kap, Dennis Williams.
7      Q   Anyone else?
8      A   Payroll.
9      Q   Mike Kap, Dennis Williams.  Who else?
10     A   I don't know.
11     Q   Is there any particular person at the club
12 level --
13     A   I don't know.
14     Q   -- who deals with that?
15     A   Don't know.
16     Q   Are you aware of a lawsuit brought by a
17 Ms. Espinoza and others against Galardi South
18 Enterprises, Inc.; Galardi South Enterprises
19 Consulting, Inc.; Fly Low, Inc.; Teri Galardi; Michael
20 Kap; Dennis Williams; LVA Management Consulting, Inc.;
21 AQFC, LLC; Kodrenyc, LLC; AK'N Eli, LLC; Akinyele
22 Adams; Nitty 'N AK Corporation; and Jack E. Galardi,
23 LLC?  Excuse me.  One more.
24     A   Well, they pulled --
25     Q   MBJG --

Page 56

1      A   They pulled a lot out of that one, didn't
2  they?
3      Q   Let me add one more.  My question is not
4  finished -- MBJG Investment Corporation.
5      A   I am aware of the case.
6      Q   And Rick Taylor and JEG Family Trust?
7      A   Wow.  Yeah.
8      Q   You're aware of that case.  And that was
9  filed in April the 8th, 2014.  And that was an FLSA
10 case also, was it not?
11     A   Yes.
12     Q   And that was brought by entertainers against
13 those persons and entities --
14     A   Right.
15     Q   -- correct?  Correct?
16     A   Right.
17     Q   And you hired Dean Fuchs, Susan Murphey,
18 William Scott Schulten, Daniel Wayne Matlow, and
19 Stephen Whitfield Brown to represent you in that
20 matter; correct?
21     A   Personally?
22     Q   Yes.
23     A   Was I named personally in that?
24     Q   Yes.
25     A   Okay.  Then I probably would have hired them

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 57

1 personally.
2   Q   Did those lawyers give you advice in that
3 case?
4   A   Yes.
5   Q   They gave you advice about the
6 classification of the entertainers; correct?
7           MR. FUCHS: Objection.  Form.  Don't
8 answer that question.
9           MR. DUDLEY: Are you saying that
10 invades the --
11           MR. FUCHS: Yes.
12           MR. DUDLEY: -- attorney-client, the
13 fact that they gave advice?
14           MR. FUCHS: Yes.
15           MR. DUDLEY: Not revealing the
16 substance of the communications?
17           MR. FUCHS: Yes.
18           MR. DUDLEY: Well, I disagree with you.
19 That's --
20           MR. FUCHS: That's fine.
21           MR. DUDLEY: -- not considered a --
22           MR. FUCHS: That's fine.
23           MR. DUDLEY: -- attorney-client
24 communication.
25           MR. FUCHS: That's fine.  If you say

Page 58

1 so.
2           MR. DUDLEY: Okay.  Fine.  You're going
3 to instruct her not to answer?
4           MR. FUCHS: I think I have.
5 BY MR. DUDLEY:
6   Q   Okay.  Did those attorneys give you advice
7 about the classification of entertainers?
8           MR. FUCHS: Don't answer that question.
9 BY MR. DUDLEY:
10   Q   Did they give you advice about the meaning
11 of a service charge under the FLSA?
12           MR. FUCHS: Don't answer that question.
13 BY MR. DUDLEY:
14   Q   Did they give you advice about whether the
15 minimum wage should be paid to these entertainers?
16           MR. FUCHS: Don't answer that question.
17 BY MR. DUDLEY:
18   Q   Do you know whether there was an order
19 entered in that case ruling that the dancers were
20 employees rather than independent contractors?
21           MR. FUCHS: Objection to form.  If you
22 know, you can answer.
23           THE WITNESS: I don't know.
24 BY MR. DUDLEY:
25   Q   Are you aware of a lawsuit brought by an

Page 59

1 entertainer with the last name Mickle against Country
2 Club, Inc., doing business as Goldrush, April
3 the 22nd, 2014, alleging the same FLSA violations?
4   A   No.
5   Q   Is it customary for you not to know about
6 FLSA lawsuits that are brought against companies you
7 own?
8   A   I may be -- I'm usually told, but it doesn't
9 mean I remember them.
10   Q   Did you take any acts or did anyone on your
11 behalf take any acts after the Espinoza case was filed
12 to make sure that --
13   A   Is that the Fly Low?
14   Q   I believe that Fly Low was one of the
15 defendants in that case.
16   A   Well, that club was sold.
17   Q   Okay.
18   A   Like two months -- two months after that, so
19 I don't know what they did.
20   Q   What's the status of that club now?  Is
21 it --
22   A   It's not mine.
23   Q   Okay.  So your contention there would be
24 there's no acts for you to take because you don't own
25 it anymore; right?

Page 60

1   A   That's right.
2   Q   Do you have an interest in a company called
3 Bella Mia, Inc.?
4   A   Yes.
5   Q   Is that an adult entertainment club?
6   A   Yes.
7   Q   Where is that club?
8   A   Florida.
9   Q   Where in Florida?
10   A   I believe that's the Doral club.
11   Q   That's what you referred to earlier as the
12 Pink Pony Doral?
13   A   Mm-hm (affirmative).
14   Q   So that's Bella Mia, Inc., doing business as
15 the Pink Pony?
16   A   I think so.  I don't know.  My dad had a lot
17 of Bella Mia, Mia Luna.
18   Q   Where did those come from?  Do you know?
19   A   I don't know.
20   Q   That's a company you own?
21   A   Mm-hm (affirmative).
22   Q   Are you the officer?
23   A   No.
24   Q   You're not?
25   A   I don't think so.

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

---

Page 61

1  Q   You're not an officer of that company?
2  A   I don't think so.
3  Q   Who do you understand is?
4  A   Jennifer -- Jennifer Saunders and Steve
5  Ennis.
6  Q   Are you aware of an entertainer named
7  Minervini and others bringing an FLSA lawsuit on
8  March the 31st, 2014, against Bella Mia, doing
9  business as the Pink Pony?
10  A   Yes.
11  Q   And you were an individual in that case,
12  individually named in that case also, were you not?
13  A   I don't know.
14  Q   You don't know if you were sued?
15  A   I don't remember.  If it says I was, then I
16  guess I was.
17  Q   Galardi South Enterprises, Inc., and Galardi
18  South Enterprises Consulting, Inc., were also named as
19  parties in that case?
20  A   If that's what it says.  I don't know.  You
21  have the paper.
22  Q   It says in that case you were represented by
23  Daniel Wayne Matlow; is that correct?
24  A   Yes.
25  Q   Who is Daniel Wayne Matlow?

---

Page 62

1  A   An attorney in Florida.
2  Q   Mr. Matlow -- well, strike that.
3       Did you seek legal advice from Mr. Matlow in
4  that case?
5  A   I didn't.  I didn't talk with him a lot.  I
6  talked with him maybe once.
7  Q   And when was that?
8  A   I don't know.
9  Q   Was that after the lawsuit had been filed?
10  A   Well, I wouldn't have talked to him before
11  the lawsuit would have been filed.
12  Q   I don't know whether you would or not.
13  A   No.
14  Q   Has he represented you on more than one
15  matter?
16  A   I don't know.
17  Q   Did you take any actions to make sure that
18  Bella Mia complied with the FLSA after receiving this
19  lawsuit?
20  A   Those were bartenders who were on payroll.
21  Q   They were?
22  A   Yes, they were.
23  Q   Okay.  What were they alleging?
24  A   I believe, some overtime or whatever.  They
25  were on payroll.  They had timecards.  We settled with

---

Page 63

1  them just to avoid legal fees.
2  Q   Okay.  Are you aware of a lawsuit brought by
3  someone named Carter against Galardi South
4  Enterprises, Inc.?
5  A   No.
6  Q   This lawsuit named Galardi South
7  Enterprises, Inc., as a defendant; Galardi South
8  Enterprises Consulting, Inc., as a defendant; Pony
9  Tail, Inc., as a defendant, doing business as Onyx;
10  Teri Galardi, individually, as a defendant.
11      Are you telling me --
12  A   I don't remember.
13  Q   -- you're not aware of that lawsuit?
14  A   I don't remember.  I don't know.
15  Q   The docket sheet in the case indicates it
16  was filed in September the 2nd, 2014.
17      You don't recall being served or notified of
18  this lawsuit sometime after that date?
19  A   Don't remember the name.
20  Q   Okay.  The Onyx is a club you own; correct?
21  A   Correct.
22  Q   You were represented by Mr. Fuchs in that
23  matter?
24  A   I guess I probably was, but I don't remember
25  that name.

---

Page 64

1  Q   Do you know whether you sought legal advice
2  in that matter?
3  A   I don't remember doing anything with one
4  named Carter.
5  Q   You don't know whether that was settled on
6  your behalf?
7  A   I have no idea.
8  Q   Let me correct that.  You don't know whether
9  that's still pending?
10  A   I don't know.
11  Q   And you have not participated in any
12  mediations with Judge Grayford?
13  A   No.
14  Q   Are you aware of an FLSA case brought by
15  Alyssa Hanson on behalf of herself and others
16  similarly situated against Country Club, Inc., doing
17  business as Goldrush Showbar; TROP, Inc., doing
18  business as Pink Pony?  Are you aware of that?
19  A   I don't recall the name.
20  Q   Are you aware of the lawsuit?
21  A   I don't recall the name Hanson.
22  Q   Are you aware of this lawsuit being filed?
23  A   I don't know.
24  Q   In front of --
25  A   I don't know what it is.

---

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 65

1    Q   -- Judge Totenberg?
2    A   I don't know.
3    Q   Do you know whether TROP, Inc., or Pony
4  Tail, Inc., were given any legal advice about this
5  matter?
6    A   I don't know.  It doesn't sound familiar to
7  me.  I don't know about it at all.  Don't remember.
8    Q   Are you aware of a lawsuit brought by
9  Jennifer Backus against Country Club, Inc. --
10    A   I don't know that name either.
11    Q   Let me finish -- on April the 1st, 2015?
12    A   No.
13    Q   The docket sheet in that case represents
14  that Dean Fuchs and Stephen Whitfield Brown
15  represented Country Club, Inc.
16        Do you know whether they gave any legal
17  advice about classification of entertainers?
18    A   I don't know.
19    Q   You're aware of a lawsuit brought by
20  Vernitta Geter and others alleging a Fair Labor
21  Standards Act violation, on May the 22nd, 2014?  Are
22  you aware of that lawsuit?
23    A   Which club was that?
24    Q   Geter v. Galardi South Enterprises
25  Consulting, Inc.; Galardi South Enterprises, Inc.; Fly

Page 66

1  Low, Inc.; John Steve Ennis; Teri Galardi; Rick
2  Taylor; Dennis Williams; Akinyele Adams; Terry
3  Elliot -- are you aware of that lawsuit?
4    A   Yes.
5    Q   And you hired Daniel Wayne Matlow, Dean
6  Fuchs, Susan Murphey, William Scott Schulten, and
7  Stephen Whitfield Brown to represent you in that
8  matter?
9    A   Yes.
10    Q   Did you seek legal advice from them about
11  the lawsuit?
12    A   Yes.
13    Q   The claims in these two cases that we're
14  dealing with today involve the same issues, do they
15  not?
16    A   I guess so.
17    Q   Do you know whether that action is still
18  pending?
19    A   What action?
20    Q   The one I just asked you about.
21    A   Geter?
22    Q   Geter or Geter.
23    A   Geter or Geter.  I believe we settled that.
24    Q   After this lawsuit was filed, did you
25  undertake any action to ascertain whether your clubs

Page 67

1  were in compliance --
2    A   That club was sold.
3    Q   -- compliance with the FLSA?
4    A   That club was sold.
5    Q   Did you take any action in your clubs, other
6  than this one, to ascertain whether they were in
7  compliance with the FLSA?
8    A   I don't recall taking any action.
9    Q   Do you know whether anybody took any action
10  on your behalf or behalf of any of your clubs?
11    A   I don't know.  I don't know.
12    Q   Is it not important to you to have
13  appropriate action taken?
14        MR. FUCHS: Objection to form.  You can
15    answer, I guess.
16        THE WITNESS: Ask me again.
17        MR. DUDLEY: Read back the question,
18    please.
19      (The record was read by the reporter.)
20        THE WITNESS: Is it not important to
21    me?  Yes, it's important to me.
22  BY MR. DUDLEY:
23    Q   Are you aware of a suit that was brought by
24  Candace Sittner on behalf of herself and others --
25    A   No.

Page 68

1    Q   -- against Country Club, Inc. --
2    A   No.
3    Q   -- doing business as the Masters Club and
4  Mike Kap individually?
5    A   No.
6    Q   You're not aware of that?
7    A   No.
8    Q   Again, you own a hundred percent --
9    A   I do not --
10    Q   -- of Country Club, Inc.
11    A   I don't know the name.  Just because I own
12  it, doesn't mean I know all of that.
13    Q   Do you know whether Dean Fuchs and Stephen
14  Brown represented Country Club, Inc., in that matter?
15    A   I don't -- I told you I don't remember the
16  name, so how could I know who represented them in
17  there -- on that?
18    Q   Well, let me --
19    A   I don't remember the name of that case.  I
20  don't remember it.  I was -- I don't know.
21    Q   Well, let me ask you this.  Have you used
22  anyone other than the attorneys at Schulten and Ward
23  to handle an FLSA matter for you or your clubs since
24  the Clincy decision?
25    A   In Georgia, no.

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 69

1    Q    What about other states?
2    A    Florida, yeah.
3    Q    Local counsel in Florida?
4    A    Right.
5    Q    What about South Carolina?  Local counsel in
6    South Carolina?
7    A    I don't know.
8    Q    Are you aware of a lawsuit brought by
9    Terrence Walker against you and others in the U.S.
10   District Court for the Southern District of Florida in
11   April or on April the 24th, 2013?
12   A    I don't recall that name either.  What club
13   was that?
14   Q    Fly Low, Inc., doing business as Crazy Horse
15   Saloon and you individually.
16   A    And when was that?
17   Q    That was in April 2013.
18   A    I don't even think we were open in
19   April 2013.  I don't know who that is.
20   Q    It looks like from the docket sheet that you
21   were represented by Daniel Wayne Matlow.
22        Does that ring a bell?
23   A    Yeah.  I told you I knew who he was.
24   Q    He represents you in Florida?
25   A    On some things.

Page 70

1         MR. FUCHS: I'm sorry, Ainsworth.  Can
2    we go off the record for just a second?
3         MR. DUDLEY: That fine.
4         (Brief pause in the proceedings.)
5    BY MR. DUDLEY:
6    Q    Mr. Matlow has given you advice, FLSA
7    advice, in Florida?
8    A    You know --
9         MR. FUCHS: I'm going to object.
10   You're getting into attorney-client privileged
11   information.  I'm going to direct her not to
12   answer.
13        MR. DUDLEY: Attorney-client privilege?
14   Is that what you're contending?
15        MR. FUCHS: Are you asking me?
16        MR. DUDLEY: Yes.
17        MR. FUCHS: Yes.
18   BY MR. DUDLEY:
19   Q    Do you know what Mr. Walker did for Crazy
20   Horse?
21   A    No.
22   Q    Crazy Horse is not a male adult
23   entertainment club, is it?
24   A    No.
25   Q    Would that lead you to believe --

Page 71

1    A    It was not.
2    Q    It was not?
3    A    It doesn't exist.
4    Q    Would that lead you to believe that maybe he
5    does something other than entertaining?
6    A    Yeah.  He's not an entertainer.
7    Q    Are you aware of a lawsuit filed by Marco
8    Watts versus Bella Mia on --
9    A    Yes.
10   Q    -- December the 5th, 2014, alleging an
11   FLSA violation?
12   A    Yes.  He's a DJ.
13   Q    And Bella Mia, again, is the Pink Pony down
14   in Florida?
15   A    Yes.
16   Q    And you were named as a defendant in that
17   case?
18   A    I guess.
19   Q    You were represented by Gerald Tolbin?
20   A    Yes.
21   Q    Who is Gerald Tolbin?
22   A    An attorney in Florida.
23   Q    Were you represented by Howard Brodsky?
24   A    He's his partner.
25   Q    Did these two gentlemen give you advice

Page 72

1    about this matter?
2    A    They handled -- they talked back and forth
3    with us.  Yes.  Marco Watts was a DJ who was paid.
4    Once again, we settled to avoid any further legal
5    costs.  The lawyers are making quite a bit of money on
6    these things.
7    Q    Well, the club's making quite a bit of money
8    too.
9    A    The dancers make a lot of money.  The DJs
10   make a lot of money.  We pay a lot of taxes and lawyer
11   fees.
12   Q    In that case, do you recall the DJs saying
13   they were employees rather than independent
14   contractors?
15   A    I don't know the DJs.  I don't know any -- I
16   don't know them, but I know that he was paid.
17   Q    You mentioned a second ago that Mr. Tolbin
18   and Mr. Brodsky gave us some advice.
19        Who were you referring to when you said
20   "us"?
21   A    It would have been Steve Ennis.
22   Q    Are you aware of a lawsuit brought by
23   Melissa August against Bella Mia on October the 20th,
24   2015, alleging a violation of the FLSA?
25   A    Yes.

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 73

1    Q   She was an entertainer?
2    A   She was a bartender with a paycheck.
3    Q   This lawsuit had a number of other
4  plaintiffs. Were they --
5    A   Bartenders.
6    Q   They were all bartenders?
7    A   Mainly bartenders with paychecks.
8    Q   When you say "mainly," what other types of
9  alleged employees were involved?
10   A   There might have been a waitress or
11 something. I'm not really sure.
12   Q   Any entertainers?
13   A   I don't think so. I don't think
14 entertainers were on that. Those are all employees.
15 Disgruntled employees.
16   Q   And you were represented by Mr. Brodsky in
17 that matter?
18   A   Correct.
19   Q   And he advised you on that litigation?
20   A   Yes.
21   Q   Are you aware of a lawsuit brought by Tierra
22 Anderson on October the 22nd, 2015, alleging a --
23   A   No.
24   Q   -- violation of the Fair Labor Standards
25 Act?

Page 74

1    A   No.
2    Q   You were named as a defendant in that case.
3  You're not aware of that lawsuit?
4    A   Who else was named in that case?
5    Q   Galardi South Enterprises; Galardi South
6  Enterprises Consulting; MBJG; Fly Low; JEG Family
7  Trust; Teri Galardi; Rick Taylor; Akinyele Adams.
8    A   I didn't own the club in 2015. They just
9  pulled names out of the computer.
10   Q   And you hired Dean Fuchs to represent you in
11 that case?
12   A   I was probably dismissed off it. I didn't
13 own the club then. I don't know. I don't remember
14 that name.
15   Q   You don't know whether Dean represented you
16 in that case?
17        THE WITNESS: Did you?
18        MR. FUCHS: I'm happy to answer if
19    Mr. Dudley wants me to.
20        MR. DUDLEY: Unfortunately, it's not --
21        MR. FUCHS: But I can't answer. I
22    can't answer.
23        MR. DUDLEY: -- his deposition.
24        THE WITNESS: I don't know. I don't
25    even remember the name. And I don't -- I didn't

Page 75

1    own the club in 2015.
2  BY MR. DUDLEY:
3    Q   Is it typical for Mr. Fuchs to represent you
4  in a lawsuit that you don't know about?
5    A   If I don't remember the name, I can't --
6  that's all I can tell you is I don't remember the
7  name.
8    Q   Is it typical for Mr. Fuchs to represent you
9  in a claim that you don't know about?
10        MR. FUCHS: Objection to form.
11        THE WITNESS: I'm telling you I don't
12    remember the name.
13 BY MR. DUDLEY:
14   Q   Okay. Are you aware of a lawsuit brought by
15 Jessica De Andino on January the 26th, 2017, alleging
16 a violation of the Fair Labor Standards Act against
17 TROP, Inc., doing business as Pink Pony?
18   A   No. I don't know what that one is.
19   Q   Well, that would have been two months ago.
20 You don't remember --
21   A   Yeah.
22   Q   -- a lawsuit being filed against you? Let
23 me correct that -- against TROP, Inc.?
24   A   No. I don't know about it.
25   Q   Are you aware of a lawsuit brought by

Page 76

1  Stephanie Kuykendall and others against TROP, Inc.,
2  doing business as Pink Pony, on February the 7th,
3  2017, alleging that Pink Pony was not arbitrating
4  cases that they were required to arbitrate?
5    A   I don't know that name either. I don't
6  recall that name. Who are you representing?
7    Q   I am representing the claimants against
8  these two arbitrations.
9    A   I don't know who they are. That's what I'm
10 asking you, their name.
11   Q   I will -- unfortunately, I'm taking the --
12 he can tell you who they are.
13        MR. FUCHS: I'll tell you that
14    afterwards.
15        THE WITNESS: Okay.
16 BY MR. DUDLEY:
17   Q   You own a club in Las Vegas. Has that club
18 been sued by any entertainers for FLSA violations?
19   A   Not that I'm aware of.
20   Q   Are you relying on any legal advice as a
21 defense in this case?
22        MR. FUCHS: Objection to form. If you
23    understand his question, do your best to answer.
24        THE WITNESS: Say it again. Why
25    wouldn't I rely on legal advice or legal -- why

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 77

1    wouldn't I rely on the lawyer? Why wouldn't I?
2    BY MR. DUDLEY:
3      Q   I have to ask you that question because
4    you're -- you have filed an answer in this case, and
5    you are asserting that you are relying on advice of
6    counsel. And that's what your attorney has
7    represented to me and the arbitrator in this case.
8          And so what I'm asking you is: What legal
9    advice are you relying on?
10         MR. FUCHS: Objection to form. I think
11    you misstated the defense.
12         But if you know, you can answer.
13         THE WITNESS: I don't know what he's
14    getting at.
15   BY MR. DUDLEY:
16     Q   Well, it's not important that you know what
17   I'm getting at. What's important is whether you are
18   relying on anything an attorney told you as a defense
19   in the case. And if you are, I need to know what
20   attorney you're relying on and what the advice was.
21     A   In this case?
22     Q   In these two arbitrations.
23         MR. FUCHS: Let me place an objection
24    on the record. I don't want you to discuss with
25    Mr. Dudley anything that you and I have talked

Page 78

1    about in which I have imparted legal advice to
2    you. Okay? With that objection, you can answer
3    his question if you can.
4          THE WITNESS: In any legal matter, I
5    would rely on my lawyer to give me correct
6    advice. I don't know if that's the question
7    you're asking me or not, but that's my answer.
8    BY MR. DUDLEY:
9      Q   Is there a lawyer you're relying on?
10     A   What?
11     Q   Is there a lawyer whose advice you're
12   relying on? Who is that lawyer?
13     A   In this case?
14     Q   No. I don't know how much clearer I can put
15   it. You have asserted a good-faith defense in this
16   case. And your attorney has represented in discovery
17   responses that I am not or my client is not entitled
18   to liquidated damages against your clients because you
19   have acted in good faith. And part of that good-faith
20   defense is that you're relying on counsel. And if you
21   are relying on counsel, now is your time to let me
22   know who the counsel was and what the advice was. I'm
23   not going to ask you again. This is the defense in
24   the case.
25     A   The counsel would be Dean.

Page 79

1      Q   You're relying on Dean's advice. Are you
2    relying on any other attorney's advice?
3      A   No.
4      Q   Okay. And when did Dean give you this
5    advice that you're relying on?
6      A   Oh, I don't know.
7      Q   You don't know?
8      A   No. I am in and out of town all over the
9    place. I don't know. I don't remember last week.
10     Q   Can you tell me what the advice was?
11     A   No.
12         MR. FUCHS: Objection. Don't answer
13    that question.
14   BY MR. DUDLEY:
15     Q   All right. Are you relying on industry
16   custom or practice as part of your good-faith defense
17   in this case?
18         MR. FUCHS: I'm going to object just to
19    the extent you're asking legal -- you're asking
20    her for legal conclusions in terms of what the
21    good-faith defense is.
22         MR. DUDLEY: I'm not.
23         MR. FUCHS: If you understood --
24         MR. DUDLEY: Hang on.
25         MR. FUCHS: I'm not expecting you to

Page 80

1    agree with my objection. I'm just stating my
2    objection.
3          If you understood his question, you can
4    answer.
5          THE WITNESS: No. I don't know what --
6    I don't know.
7    BY MR. DUDLEY:
8      Q   I'll try to explain this again too. You
9    have asserted a good-faith defense in this case. And
10   your attorney, in discovery responses and in the
11   answer in the case, has said that -- that industry
12   custom is part of that defense, that you're relying on
13   industry custom.
14         But now is your opportunity to tell me
15   whether that's true and, if so, tell me what the
16   custom is you're relying on.
17         MR. FUCHS: Objection to form. If you
18    understood the question, please answer.
19         THE WITNESS: I think you would have to
20    ask somebody else. You're asking me about
21    operations in the club.
22   BY MR. DUDLEY:
23     Q   No, I'm not. I'm asking about your defense,
24   not the clubs.
25     A   Are you asking me whether or not I think

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 81

1 these girls are independent contractors, if they're
2 entertainers, if -- are you asking me that? How I
3 feel about that, is that what you're asking me, my
4 opinion and how I feel about that?
5        MR. DUDLEY: Read back my question.
6        THE WITNESS: I think you're asking me
7     how I feel about that.
8        MR. FUCHS: Let her read back the
9     question, and do the best you can to answer.
10       (The record was read by the reporter.)
11       THE WITNESS: Do you want me to tell
12    you if I'm relying on the custom of the industry
13    and how entertainers are treated in the industry
14    across the country?
15 BY MR. DUDLEY:
16    Q   If you are relying on that.
17    A   And -- and -- and years of practices? Is
18 that what you're asking me?
19    Q   Well, I'm not going to --
20    A   And how the entertainers want to be treated,
21 how they -- they want to make their money?
22    Q   Tell me the --
23    A   Is that what you're asking me?
24    Q   -- factual basis of your defense.
25    A   They're entertainers. They're independent

Page 82

1 contractors. Just like a comedian you would hire in a
2 club or a singer you would hire in a club, they're --
3 and, as a matter of fact, in Las Vegas, they have
4 business licenses.
5    Q   Well, let's talk about the Georgia folks
6 we're dealing with.
7        What is the factual basis of your --
8    A   And I don't know --
9    Q   -- defenses on industry custom?
10    A   I don't know a lot about Atlanta, honestly.
11 I could tell you more about Vegas than I could tell
12 you about Atlanta.
13    Q   Tell me --
14    A   I lived there a long time. I haven't been
15 here that long.
16    Q   Tell me the factual basis of your defense.
17    A   That was --
18    Q   You're saying that they were treated as
19 independent contractors in the past by custom.
20    A   They're entertainers who come and go as they
21 please and do what they want and wear what they want
22 and work when they want.
23    Q   Okay. And you're claiming, for those
24 reasons, that they --
25    A   And they make a lot of money.

Page 83

1    Q   And for those reasons, they're independent
2 contractors. And you were justified in treating them
3 as independent contractors for those reasons.
4    A   I'm not justifying anything, because I don't
5 operate the clubs. I'm just giving you my opinion.
6    Q   Well, you're giving me more than your
7 opinion, because you're a party to this arbitration,
8 and you've raised this defense on your behalf. So I'm
9 asking about them.
10       MR. FUCHS: I think she's just answered
11    your question.
12 BY MR. DUDLEY:
13    Q   So you're saying it's industry custom to
14 classify them as independent contractors; correct?
15    A   As far as I know.
16    Q   Are you relying --
17    A   As far as I know. I'm just relying on what
18 I know as far as I know.
19    Q   I understand.
20    A   It's what every club does, what every
21 entertainer wants.
22    Q   Are you relying on any other custom?
23    A   I don't know any other customs.
24    Q   Are you relying on the fact that you think
25 the entertainer's choice to be treated as an

Page 84

1 independent contractor is a defense to the claim? Is
2 that what you said?
3        MR. FUCHS: Objection to form. I
4     didn't hear you. I didn't hear the question. If
5     you could repeat it, I would appreciate it.
6        MR. DUDLEY: Would you read it back,
7     please.
8        (Discussion off the record.)
9 BY MR. DUDLEY:
10    Q   Are you contending the fact that the
11 entertainers want to be employees, according to you?
12    A   No. They don't want to be employees.
13    Q   I'm sorry. The entertainers want to be
14 independent contractors, according to you? That's
15 what you're --
16    A   Right.
17    Q   That's what you believe?
18    A   Right.
19    Q   And you think that's a defense to the claim
20 under the FLSA?
21    A   I don't know if it's a defense or not. I
22 don't know. Ask my lawyer if it's a defense. I don't
23 know.
24    Q   Who made the decision to classify the
25 entertainers in your clubs as independent contractors?

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 85

1  A  My father.
2  Q  Do you know when he made that decision?
3  A  A long time ago.
4  Q  Once you inherited your interest in these
5  clubs, you made the decision to continue classifying
6  these dancers as independent contractors?
7  A  It's been that way for years.  In the past
8  couple years, there's a lot of lawyers who solicit
9  these entertainers for lawsuits.  Wage and hourly is
10  the going thing right now.  It's the new ambulance to
11  chase.
12  Q  And you made the decision to continue
13  classifying --
14  A  I didn't make any decision.  When I took
15  over the companies, it was, you know, status quo.  I
16  thought, you know, my father put good people in good
17  positions, and he was a smart man.
18  Q  Well, you know what happened in Clincy.  And
19  after Clincy, you decided to continue to --
20  A  It doesn't mean it was right.
21  Q  Let me finish.  You decided to continue -- I
22  know you disagree with Judge Story.  But you made the
23  decision to continue --
24  A  I didn't make any decision.
25  Q  Let me finish my question.

Page 86

1      You made the decision to continue
2  classifying the entertainers as independent
3  contractors.
4  A  No, I didn't.
5  Q  All right.  Who made that decision?
6  A  No decision was made one way or the other.
7  It just --
8  Q  You continued to do it.
9  A  We continued operating the way we'd been
10  operating.
11  Q  And they are independent contractors at
12  these clubs up to this day.
13  A  Yes.  As far as I know.
14  Q  Who made the decision to not pay the minimum
15  wage?
16  A  Oh, they make minimum wage.  They make a lot
17  of money.
18  Q  I understand that they make money that
19  customers give them.
20      But who made the decision on behalf of your
21  adult entertain --
22  A  I don't know.
23  Q  Let me finish my question.
24  A  I don't know.
25  Q  Who made the decision not to pay the

Page 87

1  entertainers the minimum wage?
2      MR. FUCHS: Objection to form.  If you
3  can answer his question --
4      THE WITNESS: I don't know.
5  BY MR. DUDLEY:
6  Q  You don't know who, if anyone, made that
7  decision?
8  A  No.
9  Q  All right.  It is a true statement that
10  since you have become owner and officer of the adult
11  entertainment clubs you own, that these clubs have not
12  paid the entertainers minimum wage; correct?
13      MR. FUCHS: Objection to form.  You can
14  do your best to answer his question.
15      THE WITNESS: Can you ask me that
16  again, please.
17      MR. DUDLEY: Read it back, please.
18      (The record was read by the reporter.)
19      MR. FUCHS: Same objection.
20      THE WITNESS: I don't know.
21  BY MR. DUDLEY:
22  Q  You don't know whether you've paid the
23  minimum wage?
24  A  They get paid a lot of money, so I -- we
25  don't have to pay -- we -- they -- they get paid a lot

Page 88

1  of money.  They're independent contractors.
2  Q  You understand the --
3  A  They get paid a lot of money.
4  Q  You understand the minimum wage is seven
5  twenty-five an hour?
6  A  (Witness nods head affirmatively.)
7  Q  And you --
8  A  Do you think they make seven twenty-five an
9  hour?
10  Q  And you admit that --
11  A  Do you think they make twenty-seven --
12      MR. FUCHS: Teri --
13      THE WITNESS: -- seven twenty-five an
14  hour?
15      MR. FUCHS: Teri, he doesn't have to
16  answer your questions.  Let him -- let him ask,
17  and you answer.  That's the way it works.
18  BY MR. DUDLEY:
19  Q  Can you admit that Goldrush paid none of the
20  entertainers who are at issue in this case seven
21  twenty-five an hour?  Correct?
22      MR. FUCHS: Objection to form.
23      THE WITNESS: No, I do not admit that.
24  BY MR. DUDLEY:
25  Q  You do not admit that the Pink Pony does not

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 89

1  pay seven twenty-five an hour?
2      A   I don't admit that.
3          MR. FUCHS: Objection to form.
4  BY MR. DUDLEY:
5      Q   How much do you contend they pay these
6  entertainers an hour?
7      A   I'm here as Teri Galardi, and I don't pay
8  them anything.
9      Q   I understand that.  But we're not talking
10 about what you --
11     A   We are.  I'm here as Teri Galardi.  That's
12 who I'm here as; right?
13     Q   You don't live in a vacuum.
14     A   I'm here as Teri Galardi.  I don't pay them
15 anything.
16     Q   I understand that.
17     A   I don't have anything to do with that.  I
18 don't know how it operates there.  I honestly don't.
19 So that's my answer.
20     Q   You understand that the entertainers that
21 we're here about, they have to pay moneys to Pink Pony
22 and Goldrush to dance, or employees of Pink Pony or
23 Goldrush or independent contractors of Pink Pony or
24 Goldrush; correct?
25     A   Correct.

Page 90

1      Q   Who made the decision to make these
2  entertainers pay these amounts?
3      A   My father.
4      Q   Do you know when he made that decision?
5      A   No, I don't.
6      Q   And when you inherited these adult
7  entertainment clubs, you continued to adhere to that
8  policy; right?
9      A   I don't even -- I don't know what's paid.  I
10 don't know what's not paid.  Honestly, I don't.
11 You're asking me stuff that I really don't know about.
12     Q   Do you contend that these entertainers were
13 paid a service charge by Pink Pony or Goldrush?
14     A   They were paid a service charge?  I don't
15 know about any service charge that the club paid or I
16 paid or anybody paid.  I don't know about any service
17 charge.
18     Q   You understand that entertainers at the Pink
19 Pony and Goldrush are required to sign written
20 independent contractor agreements?
21     A   I guess they would probably all sign an
22 independent contractor agreement.
23     Q   Who made the decision to use these written
24 independent contractor agreements?
25     A   My father.

Page 91

1      Q   And when you became the owner of these
2  clubs, did you continue that policy?
3      A   I guess I did.  I didn't, you know, change
4  anything that he did.
5      Q   And despite all these lawsuits, you just
6  continued to use an independent contractor agreement
7  and classify these entertainers --
8      A   If they want to be --
9      Q   -- as independent contractors?
10     A   If they want to be considered as employees,
11 they can.  And none of them do.
12     Q   Has that ever happened?
13     A   Yeah.  Has it happened that they want to be
14 employees?
15     Q   Yes.
16     A   No.  They don't want to be employees.
17     Q   Pink Pony and Goldrush utilize arbitration
18 agreements?
19     A   Yes.
20     Q   And the decision was made to use these
21 arbitration agreements to avoid collective and class
22 actions under the FLSA?
23         MR. FUCHS: Objection to form.  If you
24     know, you can answer.
25         THE WITNESS: I don't know.

Page 92

1  BY MR. DUDLEY:
2      Q   Well, I think you've testified to that
3  before, have you not?
4      A   Well, I testified that we would -- we're not
5  saying that anybody can't have a disagreement with us,
6  but we will deal with disagreements on an individual
7  basis.  That's probably what I testified for.
8          THE WITNESS: Excuse me.  I need to use
9      the restroom.
10         MR. FUCHS: Sure.  Do you want to take
11     a break?
12         MR. DUDLEY: Sure.
13     (Brief pause in the proceedings.)
14 BY MR. DUDLEY:
15     Q   My question to you is whether your company
16 started using arbitration agreements to avoid FLSA
17 class or collective actions.
18     A   Well, we haven't done a very good job of
19 avoiding them, have we?
20     Q   Some may argue with that, but --
21     A   I don't think that that -- it has avoided
22 that, so --
23     Q   But that was the reason they were
24 instituted?
25     A   The reason was we wanted to deal with --

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 93

1  we're not saying you can't have a dispute.  We're just
2  saying, "Come to us, and we'll deal with the dispute."
3      Q    And you made the decision to require
4  entertainers at clubs you own to sign arbitration
5  agreements?
6      A    I didn't personally make that decision.
7      Q    Let me turn back to that deposition you had
8  with Mr. Miller back on April the 25th, 2015.
9          He asked you:  Who was it that made the
10  decision to require entertainers at all the clubs to
11  sign arbitration agreements?
12         And your response was:  Well, it was
13  something that Dennis and I talked about kind of early
14  on --
15      A    You're asking me --
16      Q    Let me finish -- just because there were so
17  many class action suits.  And my feeling was, you
18  know -- and we weighed the pros and cons.  But my
19  feeling was I didn't care if somebody had a beef with
20  me or our company specifically.  I just wanted to deal
21  with that on a case-by-case basis.
22         Was that your response?
23      A    Yes, that was my response.  But you're
24  asking me today as Teri Galardi personally, not as --
25      Q    I don't understand how that has a bearing

Page 94

1  on --
2      A    Well, I'm not --
3      Q    -- the truthfulness of your answer to that
4  question.
5      A    I'm not -- I'm not answering you as a
6  corporate representative.  I'm answering you
7  personally.
8      Q    You're going to have to explain that to me,
9  because I don't understand why your answer would be
10  different.
11      A    Well, it's pretty simple.  I'm here today as
12  Teri Galardi, not as president of a corporation, not
13  as a representative of a corporation.  I'm here as
14  Teri Galardi.
15      Q    So is your answer different because this is
16  individual testimony?
17      A    Yes, it is different.
18      Q    How so?
19      A    Well, as Teri Galardi, Teri Galardi is an
20  individual person, me.
21      Q    How --
22      A    If you want me to answer for the company,
23  that's a different thing.  But I'm not -- I'm not a
24  representative of the company.
25      Q    Well, that's a matter that the Courts will

Page 95

1  decide.
2      A    Okay.
3      Q    And, again, you were asked:  In any event,
4  the decision to move forward with arbitration
5  agreements was one that was made by you, meaning
6  you --
7      A    Well, you can read it from there.  You
8  already read the answer.
9      Q    Let me finish my question.
10         In any event, the decision to move forward
11  with arbitration agreements was one that was made by
12  you, meaning Teri Galardi and Dennis Williams,
13  whenever -- irrespective of whenever it was
14  implemented; is that right?
15      A    Well --
16      Q    And your response was:  That's right.
17         Was that true when you answered that
18  question?
19      A    To Harlan Miller?
20      Q    Yes.
21      A    Yes.
22      Q    Do you know who authored the arbitration
23  agreement?
24      A    No.
25      Q    Was it prepared by an attorney?

Page 96

1      A    I don't know.  I would hope so.
2      Q    You don't know which attorney?
3      A    No.
4      Q    Do you know who prepared your independent
5  contractor agreement?
6      A    No.
7      Q    And you made the decision to use the
8  arbitration agreements at all the clubs; correct?
9          MR. FUCHS:  Haven't we answered this
10      question already?
11          THE WITNESS:  I did not personally make
12      that decision.
13  BY MR. DUDLEY:
14      Q    The decision to give entertainers the choice
15  between becoming an employee or an independent
16  contractor was a decision that was made after you
17  became the owner; correct?
18      A    Yes.
19      Q    That was a decision you made?
20      A    Personally, no.
21      Q    Were you involved in the decision?
22      A    Personally, no.
23      Q    You have the power to make that decision,
24  though?
25      A    If I want to.

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 97

1    Q   The fact of the matter is you have the power
2  to make any decision, okay, regarding classification,
3  compensation, how tip-outs are handled, whether
4  something is a service charge or not, what records the
5  company keeps, and the type of agreements they use
6  with the people that work for them; correct?
7    A   I would --
8        MR. FUCHS: Objection to form.  You can
9  answer.
10       THE WITNESS: I would not do that.
11 BY MR. DUDLEY:
12   Q   I didn't ask you that.  Do you have the
13 power to do that?
14   A   I understand that.  But I would not do that.
15 I don't operate the clubs.  I don't go in the clubs.
16 I would not go throwing my weight around like that.
17   Q   You have the power to do that; correct?
18   A   Well, as the owner and the president of
19 these corporations, I suppose I would.  It is nothing
20 that I would do, ever.
21   Q   Is the answer yes, you have the power, but
22 you haven't exercise it?
23   A   I would not exercise it.  That's my answer.
24   Q   Do you have the power?
25   A   And you're -- this is something that's

Page 98

1  either true or not true as far as an owner goes;
2  correct?
3    Q   Well, that's what I'm asking you.  What is
4  your understanding?
5    A   I know what you're asking me, but I don't do
6  that.
7    Q   Your understanding is because you're the
8  owner, you have the power to do that.
9    A   I would not do that.  These were my father's
10 businesses that ran long before I -- I wasn't even
11 involved with my father's businesses.  I wouldn't do
12 that.
13   Q   Do you have the power --
14   A   I inherited this.
15   Q   And it's now yours, and it has been since
16 your father passed away; right?
17   A   I'm going to say I don't have the power.
18 How about that?
19   Q   Well, I expect you give a truthful answer --
20   A   It is a truthful answer, because I wouldn't
21 go over anybody like that.
22   Q   Who has the power to make legal decisions
23 regarding the claims we've discussed in this
24 deposition today?
25       MR. FUCHS: Objection to form.  If you

Page 99

1  understood the question, you can answer.
2        THE WITNESS: I don't know.
3  BY MR. DUDLEY:
4    Q   You don't know who has the power?
5    A   Huh-uh (negative).
6    Q   Do you have the power?
7    A   To make legal decisions?
8    Q   Regarding the claims we discussed in this
9  deposition.
10   A   I'm here as Teri Galardi, so I'm here
11 personally.
12   Q   As owner, do you have the power --
13   A   I'm not being deposed as the owner.
14   Q   As owner --
15   A   I'm being deposed as Teri Galardi.
16       MR. FUCHS: Listen to his question.
17       MR. DUDLEY: Ms. Galardi, please let me
18 finish my question.
19 BY MR. DUDLEY:
20   Q   As owner, do you have the power to make
21 legal decisions regarding the clubs you own?
22   A   Yes.
23   Q   Have you delegated that authority to anyone
24 other than yourself?
25   A   No.

Page 100

1    Q   Do you understand that you have brought
2  counterclaims against the entertainers that have
3  brought these actions?
4        MR. FUCHS: Objection to form.
5        THE WITNESS: I don't know what you're
6  talking about.  What counterclaims?
7  BY MR. DUDLEY:
8    Q   Are you aware of any counterclaims you
9  brought in this case?
10   A   Against entertainers?
11   Q   Yes.
12   A   I don't know.
13   Q   Are you aware of Goldrush or Pink Pony
14 bringing any counterclaims in the case?
15   A   Not aware.
16   Q   Do you know what those counterclaims --
17   A   I'm not aware of any.
18   Q   Okay.  You are aware that the clubs you own
19 have brought counterclaims against entertainers
20 before?
21   A   I don't know.  I don't know that.  So I
22 guess power may have been delegated to someone before
23 I came along; right?
24   Q   The counter --
25   A   To make the legal decisions, I mean, because

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

---

Page 101

1 I don't know about it.

2   Q  You don't know about counterclaims?

3   A  I don't know of -- I'm not aware of any. I

4 don't know.

5       MR. DUDLEY: I think we're probably

6 through. Let me speak with co-counsel for one

7 second.

8       MR. FUCHS: Sure.

9       (Brief pause in the proceedings.)

10       MR. DUDLEY: I don't have anything,

11 unless you guys do.

12       MR. FUCHS: I have just a few.

13       MR. DUDLEY: Okay.

14       EXAMINATION

15 BY MR. FUCHS:

16   Q  Ms. Galardi, Ms. -- Mr. Dudley -- excuse

17 me -- asked you about your job responsibilities. My

18 question is in that same vein.

19      In your own words, could you describe what

20 you consider your primary job responsibilities to be.

21   A  Now, grandmother, mother, grandmother.

22   Q  And do you travel quite a bit?

23   A  I travel a lot. I have grandchildren in

24 three states. As a matter of fact, I'm going to a

25 birthday party for my grandson, who's going to be

---

Page 102

1 three. And we just did a Disney World trip with -- I

2 brought all the grandchildren together, other family

3 members.

4   Q  Terrific. How often would you say you visit

5 any of the clubs, the adult clubs that you own?

6   A  Almost never.

7   Q  In the roughly four and a half years that

8 you've owned the clubs that your father previously

9 owned, can you tell me -- can give me an approximate

10 guess -- excuse me -- an approximation as to how many

11 times you've been to Goldrush?

12   A  Twice.

13   Q  And in the same four and a half years since

14 you've owned the clubs, can you tell me the

15 approximate number of times you've been to the Pink

16 Pony?

17   A  Probably three or four times, maybe five, to

18 look at the bathrooms.

19   Q  How frequently do you converse, speak, with

20 Mike Kap about operational matters?

21   A  Probably once every other week.

22   Q  Same question with respect to Dennis

23 Williams.

24   A  Probably twice a week, sometimes less if I'm

25 not here.

---

Page 103

1       MR. FUCHS: That's all I have.

2       MR. DUDLEY: I don't have anything.

3       MR. FUCHS: Okay. Is the witness

4 excused?

5       MR. DUDLEY: Yes. Thank you.

6     (It was agreed that the witness will reserve

7 signature.)

8     (Deposition concluded at 12:58 p.m.)

9       - - -

---

Page 104

1           DISCLOSURE

2 STATE OF GEORGIA

3 COUNTY OF CHEROKEE

4 DEPOSITION OF:  TERI GALE GALARDI

5       Pursuant to Article 8.B of the Rules and

6 Regulations of the Board of Court Reporting of the
Judicial Council of Georgia, I make the following
disclosure:

7       I am a Georgia Certified Court Reporter. I

8 am here as an independent contractor for American
Court Reporting Company, Inc.

9       The firm was contracted by the offices of

10 Ainsworth G. Dudley, Esq., to provide court reporting
services for this deposition. The firm will not be

11 taking this deposition under any contract that is
prohibited by O.C.G.A. 15-14-37(a) and (b).

12 Option A:  The firm has no contract/agreement to

13 provide reporting services with any party to the case,
any counsel in the case, or any reporter or reporting

14 agency from whom a referral might have been made to
cover this deposition. The firm will charge its usual

15 and customary rates to all parties in the case, and a
financial discount will not be given to any party to

16 this litigation.

17     (Signature of Attorneys optional.)

18

19 _____    March 29, 2017

20 AUDREY MICHELLE LING, CCR-B-1752

21

22 _____    Date:
Attorney for Plaintiff

23

24 _____    Date:
Attorney for Defendant

25

---

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

Page 105

```
 1            C E R T I F I C A T E
 2  STATE OF GEORGIA )
 3  COUNTY OF CHEROKEE )
 4          I hereby certify that the foregoing
 5      transcript was taken down, as stated in the
 6      caption, and the proceedings were reduced to
 7      typewriting under my direction and control.
 8          I further certify that the transcript is a
 9      true and correct record of the evidence given at
10      the said proceedings.
11          I further certify that I am neither a
12      relative nor employee nor attorney nor counsel to
13      any of the parties, nor financially or otherwise
14      interested in this matter.
15          This the 18th day of April 2017.
16
17
18
19
20
21
22
23          AUDREY MICHELLE LING, CCR-B-1752
24
25
```

Page 106

```
 1          E R R A T A   S H E E T
 2  IN RE:  BECTON, et al., v. COUNTRY CLUB, INC., et al.;
 3  ROBERTS, et al., v. TROP, INC., et al.
 4  NO:  N/A
 5  DEPOSITION TAKEN ON:  March 29, 2017
 6  I have read the transcript of my deposition and find
    that no changes are necessary _____.
 7
    Having read the transcript of my deposition, I wish to
 8  make the following changes:  (Please state reason.)
 9  Page _____, Line _____:
10  Page _____, Line _____:
11  Page _____, Line _____:
12
13
14
15
16
17
18
19  _____, TERI GALE GALARDI
20  Sworn to and subscribed before me, this the ____ day
21  of _____, 2017; _____
22  County, Georgia.
23
24  _____, Notary Public
25  My commission expires:  _____
```

Case 1:17-cv-00462-WSD   Document 18-2   Filed 05/30/17   Page 29 of 37

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

## A

**Abby (1)**
  49:9
**ability (1)**
  47:23
**according (2)**
  84:11,14
**across (1)**
  81:14
**Act (3)**
  65:21;73:25;75:16
**acted (1)**
  78:19
**action (12)**
  40:24;41:20;43:1;
  44:6;66:17,19,25;67:5,
  8,9,13;93:17
**actions (5)**
  54:18;62:17;91:22;
  92:17;100:3
**acts (16)**
  40:14;41:4;42:9;
  44:15;46:5;47:24;48:3,
  7,10;50:2,9,14,18;
  59:10,11,24
**Actually (1)**
  52:19
**Adams (3)**
  55:22;66:2;74:7
**add (1)**
  56:3
**adhere (1)**
  90:7
**admit (5)**
  88:10,19,23,25;89:2
**adult (20)**
  4:21;5:4,21;6:3,13;
  23:23;24:11,13,21;
  25:7;27:1,10;44:17;
  54:25;60:5;70:22;
  86:21;87:10;90:6;
  102:5
**adverse (5)**
  35:2,18;36:5;54:2,7
**advice (42)**
  36:14,20;40:6,7;
  49:12,15,20,21;52:5,7,
  13,22;53:5,8;57:2,5,13;
  58:6,10,14;62:3;64:1;
  65:4,17;66:10;70:6,7;
  71:25;72:18;76:20,25;
  77:5,9,20;78:1,6,11,22;
  79:1,2,5,10
**advise (2)**
  44:24;52:1
**advised (2)**
  54:6;73:19
**affairs (2)**
  13:23;30:25
**affiliated (1)**
  21:2;38:23

**affirmative (5)**
  5:13;14:2;51:3;
  60:13,21
**affirmatively (1)**
  88:6
**afield (1)**
  22:8
**afterwards (1)**
  76:14
**again (23)**
  15:15;32:16;35:7;
  41:19;42:1,3;43:1,7,
  19;44:6,20;46:8;47:14;
  51:9;67:16;68:8;71:13;
  72:4;76:24;78:23;80:8;
  87:16;95:3
**against (30)**
  27:3;32:6;37:2,19;
  39:21,24;40:4;48:18;
  50:1;51:4;55:17;56:12;
  59:1,6;61:8;63:3;
  64:16;65:9;68:1;69:9;
  72:23;75:16,22,23;
  76:1,7;78:18;100:2,10,
  19
**ago (4)**
  35:13;72:17;75:19;
  85:3
**agree (2)**
  46:15;80:1
**agreed (1)**
  103:6
**agreement (4)**
  90:22;91:6;95:23;
  96:5
**agreements (11)**
  90:20,24;91:18,21;
  92:16;93:5,11;95:5,11;
  96:8;97:5
**ahead (1)**
  46:9
**Ainsworth (4)**
  4:19;20:24;48:13;
  70:1
**AK (1)**
  55:22
**Akinyele (3)**
  55:21;66:2;74:7
**AK'N (1)**
  55:21
**al (4)**
  4:4,5,5,6
**alcohol (1)**
  6:17
**alive (1)**
  27:8
**alleged (1)**
  73:9
**alleging (9)**
  49:2;59:3;62:23;
  65:20;71:10;72:24;
  73:22;75:15;76:3
**Almost (1)**

  102:6
**along (1)**
  100:23
**always (1)**
  9:11
**Alyssa (1)**
  64:15
**ambulance (1)**
  85:10
**amounts (1)**
  90:2
**Anderson (1)**
  73:22
**Andino (1)**
  75:15
**answered (9)**
  41:25;45:5;46:18,24;
  47:2,7;83:10;95:17;
  96:9
**anticipate (1)**
  38:8
**anymore (1)**
  59:25
**apologize (2)**
  9:22;38:10
**appreciate (1)**
  84:5
**appropriate (2)**
  47:8;67:13
**approximate (2)**
  102:9,15
**approximation (1)**
  102:10
**April (8)**
  56:9;59:2;65:11;
  69:11,11,17,19;93:8
**AQFC (1)**
  55:21
**arbitrate (1)**
  76:4
**arbitrating (1)**
  76:3
**arbitration (11)**
  4:3;83:7;91:17,21;
  92:16;93:4,11;95:4,11,
  22;96:8
**arbitrations (2)**
  76:8;77:22
**arbitrator (3)**
  47:4;48:24;77:7
**argue (2)**
  46:22;92:20
**around (6)**
  6:4;18:20,21;45:10,
  10;97:16
**arrangement (1)**
  26:11
**ascertain (2)**
  66:25;67:6
**asserted (3)**
  21:3;78:15;80:9
**asserting (1)**
  77:5

**Atlanta (5)**
  8:18;35:19;36:6;
  82:10,12
**attorney (12)**
  32:1;44:25;53:15;
  62:1;71:22;77:6,18,20;
  78:16;80:10;95:25;
  96:2
**attorney-client (4)**
  57:12,23;70:10,13
**attorneys (8)**
  49:23,24;53:1,5,16;
  54:6;58:6;68:22
**attorney's (1)**
  79:2
**August (1)**
  72:23
**authored (1)**
  95:22
**authority (8)**
  17:16,20,25;18:5,7,
  21;53:24;99:23
**avoid (4)**
  63:1;72:4;91:21;
  92:16
**avoided (1)**
  92:21
**avoiding (1)**
  92:19
**aware (40)**
  29:22,25;30:15;37:1;
  39:11;48:17;50:20;
  51:2,2;55:16;56:5,8;
  58:25;61:6;63:2,13;
  64:14,18,20,22;65:8,
  19,22;66:3;67:23;68:6;
  69:8;71:7;72:22;73:21;
  74:3;75:14,25;76:19;
  100:8,13,15,17,18;
  101:3
**away (5)**
  5:24,25;8:17;15:18;
  98:16

## B

**back (19)**
  42:4,21;43:23;44:2;
  45:1;46:1,7;47:13,18,
  25;50:6;67:17;72:2;
  81:5,8;84:6;87:17;
  93:7,8
**Backdoor (1)**
  7:7
**Backus (1)**
  65:9
**bar (8)**
  5:23;6:12,12,13,18,
  20;7:1;12:24
**bars (4)**
  7:5,9;8:7;12:19
**bartender (1)**
  73:2

**bartenders (1)**
  6:23;62:20;73:5,6,7
**basic (2)**
  8:6;21:20
**basically (1)**
  33:12
**basis (5)**
  81:24;82:7,16;92:7;
  93:21
**bathrooms (1)**
  102:18
**bearing (1)**
  93:25
**became (2)**
  91:1;96:17
**become (1)**
  87:10
**becoming (1)**
  96:15
**Becton (1)**
  4:5
**beef (1)**
  93:19
**behalf (12)**
  50:17,17;53:13;
  54:16;59:11;64:6,15;
  67:10,10,24;83:8;
  86:20
**bell (1)**
  69:22
**Bella (9)**
  60:3,14,17;61:8;
  62:18;71:8,13;72:23
**best (7)**
  45:3,14;47:21,22;
  76:23;81:9;87:14
**birthday (1)**
  101:25
**bit (4)**
  19:18;72:5,7;101:22
**board (2)**
  9:4;16:7
**bought (1)**
  7:4
**break (2)**
  48:12;92:11
**Brief (4)**
  48:15;70:4;92:13;
  101:9
**bring (1)**
  33:2
**bringing (2)**
  61:7;100:14
**Brodsky (3)**
  71:23;72:18;73:16
**brought (27)**
  27:23;29:16;33:5;
  37:1,12,19;40:3;50:20;
  55:16;56:12;58:25;
  59:6;63:2;64:14;65:8,
  19;67:23;69:8;72:22;
  73:21;75:14,25;100:1,
  3,9,19;102:2

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

**Brown (5)**
49:8;56:19;65:14;
66:7;68:14
**business (12)**
51:15;59:2;60:14;
61:9;63:9;64:17,18;
68:3;69:14;75:17;76:2;
82:4
**businesses (5)**
18:19,20,21;98:10,
11

**C**

**call (1)**
12:7
**called (4)**
4:9;19:13;22:5;60:2
**came (3)**
35:16;36:24;100:23
**Can (54)**
5:8,19;7:14,15,25;
10:16;12:13;13:8,10;
19:21,22;20:13;23:5;
24:1,7,9;27:14;40:18;
42:1;45:3,14;46:9;
47:21,22;48:7,12;50:4,
6;51:13;52:10;58:22;
67:14;70:1;75:6;76:12;
77:12;78:2,3,14;79:10;
80:3;81:9;87:3,13,15;
88:19;91:11,24;95:7;
97:8;99:1;102:9,9,14
**Candace (1)**
67:24
**care (2)**
10:20;93:19
**Carolina (11)**
22:6,17;23:1;25:3,4;
50:22;51:20;53:20;
54:3;69:5,6
**Carter (2)**
63:3;64:4
**case (77)**
5:10,19;19:16;21:13;
22:9;23:11,16;27:2;
29:12,19;30:5;31:4,22;
32:1,18;36:11;39:13,
15,16,21,24;40:3,9,13;
41:21;43:2;44:7,13;
48:5,5,23;49:1,12;50:1,
25;51:2,22,24;52:18,
23;54:19;56:5,8,10;
57:3;58:19;59:11,15;
61:11,12,19,22;62:4;
63:15;64:14;65:13;
68:19;71:17;72:12;
74:2,4,11,16;76:21;
77:4,7,19,21;78:13,16,
24;79:17;80:9,11;
88:20;100:9,14
**case-by-case (1)**
93:21

**cases (7)**
4:4,23;5:6,6;66:13;
76:4
**CEO (3)**
5:21;35:17;36:4
**certainly (2)**
4:25;21:8
**CFO (2)**
10:18,19
**Chambers (1)**
51:23
**change (2)**
40:14;91:3
**changes (1)**
41:10
**Chantilly (1)**
10:8
**Chapman (1)**
4:20
**charge (6)**
58:11;90:13,14,15,
17;97:4
**chase (1)**
85:11
**check (1)**
10:6
**Cheetah (1)**
26:10
**Cheetahs (1)**
24:20
**chief (4)**
13:15,16,19;14:1
**choice (2)**
83:25;96:14
**choose (1)**
18:8
**Christian (1)**
31:20
**claim (5)**
27:11;50:23;75:9;
84:1,19
**claimant (1)**
49:1
**claimants (2)**
31:3;76:7
**claimants' (1)**
23:15
**claimed (1)**
33:20
**claiming (6)**
30:5,8,9,15,19;82:23
**claims (4)**
21:3;66:13;98:23;
99:8
**class (3)**
91:21;92:17;93:17
**classification (6)**
52:2;54:4;57:6;58:7;
65:17;97:2
**classify (4)**
40:25;83:14;84:24;
91:7
**classifying (3)**

**85:5,13;86:2**
**clear (1)**
36:3
**clearer (1)**
78:14
**client (1)**
78:17
**clients (1)**
78:18
**Clincy (12)**
27:24;36:17,20,24;
40:13,24;41:21;43:2;
44:7;68:24;85:18,19
**Club (84)**
4:6;5:4,14;6:14,16;
7:1,2;10:15,21,22;11:1,
18;12:25;14:5;15:11,
21,25;16:8,12,21;17:1,
8,9,11;18:4,8,24;19:4,
11;20:17;22:5,13,21,
25;24:12,13;25:4;
26:12;31:2;32:6;33:22;
37:7;40:15;50:22;51:5,
15,16,20;52:16,18;
53:1,5;54:17,19;55:11;
59:2,16,20;60:5,7,10;
63:20;64:16;65:9,15,
23;67:2,4;68:1,3,10,14;
69:12;70:23;74:8,13;
75:1;76:17,17;80:21;
82:2,2;83:20;90:15
**clubs (49)**
5:8;6:3,7;12:1,3,10;
20:18;23:11,24;25:15;
26:1;27:1,10;35:19;
36:6;41:5,22;42:10;
43:3;44:8,17;50:3;
54:25,25;55:4;66:25;
67:5,10;68:23;80:24;
83:5;84:25;85:5;86:12;
87:11,11;90:7;91:2;
93:4,10;96:8;97:15,15;
99:21;100:18;102:5,5,
8,14
**club's (1)**
72:7
**co-counsel (1)**
101:6
**collective (2)**
91:21;92:17
**comedian (1)**
82:1
**coming (1)**
21:17
**communicating (1)**
53:16
**communication (1)**
57:24
**communications (2)**
53:14;57:16
**companies (4)**
23:12;26:12;59:6;
85:15

**company (25)**
11:5,7,10;19:13;
22:5;37:21,24;38:1,18,
20,23;39:1,2,7,8;40:4;
51:10;60:2,20;61:1;
92:15;93:20;94:22,24;
97:5
**compensation (1)**
97:3
**compliance (5)**
55:1,3;67:1,3,7
**compliant (3)**
41:6;42:11;50:14
**complied (7)**
41:23;43:4;44:9,17;
48:6;54:20;62:18
**comply (6)**
41:7;42:12,19,20;
43:17;46:6
**complying (1)**
50:3
**computer (1)**
74:9
**concluded (1)**
103:8
**conclusions (1)**
79:20
**connected (1)**
51:14
**cons (1)**
93:18
**consider (1)**
101:20
**considered (2)**
57:21;91:10
**Consulting (18)**
37:20;38:2,12;39:13,
18,22;40:7;48:20;51:5,
10;52:25;54:18;55:19,
20;61:18;63:8;65:25;
74:6
**contend (2)**
89:5;90:12
**contending (2)**
70:14;84:10
**contention (1)**
59:23
**continue (8)**
20:25;85:5,12,19,21,
23;86:1;91:2
**continued (4)**
86:8,9;90:7;91:6
**contract (1)**
33:14
**contractor (9)**
35:18;49:4;84:1;
90:20,22,24;91:6;96:5,
16
**contractors (21)**
30:7,11;33:23;35:3;
41:1;58:20;72:14;81:1;
82:1,19;83:2,3,14;
84:14,25;85:6;86:3,11;

**88:1;89:23;91:9**
**conversation (2)**
31:18;40:12
**conversations (1)**
44:12
**converse (1)**
102:19
**corporate (2)**
16:13;94:6
**corporation (5)**
15:13;55:22;56:4;
94:12,13
**corporations (2)**
8:24;97:19
**costs (1)**
72:5
**counsel (7)**
69:3,5;77:6;78:20,
21,22,25
**counter (1)**
100:24
**counterclaims (7)**
100:2,6,8,14,16,19;
101:2
**Country (38)**
4:6;6:4;15:10,21,24;
16:8,12,21;17:1,10;
18:8,24;19:4,11;20:17;
22:5,12,21,25;25:4;
26:12;37:7;50:21;51:5,
15;52:18;53:1,5;54:17,
19;59:1;64:16;65:9,15;
68:1,10,14;81:14
**couple (1)**
85:8
**course (2)**
45:17,22
**Court (6)**
35:1,5,9;47:18;54:3;
69:10
**Courts (1)**
94:25
**Crazy (3)**
69:14;70:19,22
**created (1)**
38:24
**credit (4)**
7:8,12,17,23
**current (1)**
25:8
**custom (9)**
79:16;80:12,13,16;
81:12;82:9,19;83:13,
22
**customary (1)**
59:5
**customers (1)**
86:19
**customs (1)**
83:23

**D**

Case 1:17-cv-00462-WSD   Document 18-2   Filed 05/30/17   Page 31 of 37

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

**dad (2)**
30:21;60:16
**damages (1)**
78:18
**dance (1)**
89:22
**dancers (4)**
35:3;58:19;72:9;
85:6
**Daniel (5)**
56:18;61:23,25;66:5;
69:21
**date (2)**
31:24;63:18
**day (4)**
14:16,24;15:7;86:12
**Daytime (1)**
14:23
**De (1)**
75:15
**deal (8)**
18:19;23:7;44:19;
53:25;92:6,25;93:2,20
**dealing (1)**
66:14;82:6
**deals (1)**
55:14
**Dean (12)**
23:4;39:11;49:8;
51:23;56:17;65:14;
66:5;68:13;74:10,15;
78:25;79:4
**Dean's (1)**
79:1
**death (1)**
35:17
**December (9)**
6:1;8:17;15:19;
28:19,22,25;29:1;
50:23;71:10
**decide (2)**
23:3;95:1
**decided (2)**
85:19,21
**decision (38)**
17:18;18:6,8,22;
36:21;40:24;68:24;
84:24;85:2,5,12,14,23,
24;86:1,5,6,14,20,25;
87:7;90:1,4,23;91:20;
93:3,6,10;95:4,10;96:7,
12,14,16,19,21,23;97:2
**decision-making (1)**
17:16
**decisions (11)**
12:11,16;13:2,6,14;
17:19;18:23;98:22;
99:7,21;100:25
**defendant (6)**
63:7,8,9,10;71:16;
74:2
**defendants (1)**
59:15

**defending (1)**
53:2
**defense (18)**
76:21;77:11,18;
78:15,20,23;79:16,21;
80:9,12,23;81:24;
82:16;83:8;84:1,19,21,
22
**defenses (1)**
82:9
**delegated (3)**
53:24;99:23;100:22
**denied (1)**
49:3
**Dennis (22)**
10:14,16;16:17;19:2;
28:5;29:12;31:4,7,9,
18;35:10,11,12;44:12;
53:18;55:6,9,20;66:2;
93:13;95:12;102:22
**depend (1)**
17:18
**deposed (2)**
99:13,15
**deposition (9)**
4:2;21:4,9;31:21;
74:23;93:7;98:24;99:9;
103:8
**depositions (5)**
4:24;5:3;23:13,16;
31:15
**describe (1)**
101:19
**despite (1)**
91:5
**detail (1)**
49:6
**determine (2)**
41:4;42:10
**Diamonds (2)**
25:23;26:2
**died (3)**
28:14;32:23,24
**different (8)**
8:24,25;10:21;47:15;
94:10,15,17,23
**differently (1)**
20:14
**direct (3)**
22:22;23:9;70:11
**director (9)**
16:2,4,14;20:9,11;
21:25;22:12;26:14,23
**directors (3)**
9:4;16:8,11
**disagree (3)**
45:7;57:18;85:22
**disagreement (1)**
92:5
**disagreements (1)**
92:6
**disagrees (1)**
45:6

**discovery (2)**
78:16;80:10
**discuss (3)**
31:9;52:4;77:24
**discussed (4)**
31:12;54:13;98:23;
99:8
**discussion (6)**
28:5;31:4,7;35:1;
42:6;84:8
**discussions (1)**
30:24
**Disgruntled (1)**
73:15
**dismissed (1)**
74:12
**Disney (1)**
102:1
**dispute (6)**
33:13;34:11,16,22;
93:1,2
**District (3)**
54:3;69:10,10
**divesting (1)**
25:19
**DJ (2)**
71:12;72:3
**DJs (3)**
72:9,12,15
**docket (3)**
63:15;65:13;69:20
**document (1)**
35:10
**documents (3)**
16:15;39:9,10
**done (2)**
40:15;92:18
**Doral (6)**
5:16;24:20;26:10,18;
60:10,12
**down (2)**
20:25;71:13
**Drive (1)**
10:8
**DUDLEY (126)**
4:2,13,19;7:18;8:2;
12:18;19:22;20:1;21:4,
8,12,18,23;22:11,16,
18,20,24;23:4,13,22;
24:3,10;27:17;28:20,
21;30:20;40:22;41:18;
42:4,13,21;43:7,10,13,
19,22;44:1,14,20,24;
45:6,7,11,15,19,22;
46:1,7,12,18,22,25;
47:3,8,13,25;48:11,14,
16;50:6,12,15;52:12,
17;54:11;57:9,12,15,
18,21,23;58:2,5,9,13,
17,24;67:17,22;70:3,5,
13,16,18;74:19,20,23;
75:2,13;76:16;77:2,15,
25;78:8;79:14,22,24;

80:7,22;81:5,15;83:12;
84:6,9;87:5,17,21;
88:18,24;89:4;92:1,12,
14;96:13;97:11;99:3,
17,19;100:7;101:5,10,
13,16;103:2,5
**duly (1)**
4:10
**duties (1)**
43:17

**E**

**earlier (1)**
60:11
**early (1)**
93:13
**Eddie (1)**
14:25
**either (7)**
7:22;13:7;47:3;
65:10;69:12;76:5;98:1
**Eli (1)**
55:21
**Elliot (1)**
66:3
**else (10)**
11:12;19:1;25:6;
49:2;50:16;53:19;55:7,
9;74:4;80:20
**e-mail (1)**
10:6
**employee (8)**
9:21,24;17:1;20:22;
22:3,25;33:14;96:15
**employees (25)**
6:22;7:9;8:8,12;
33:21;34:4,5,13,14;
35:4;37:25;40:19,20,
25;58:20;72:13;73:9,
14,15;84:11,12;89:22;
91:10,14,16
**Ennis (3)**
61:5;66:1;72:21
**enough (1)**
36:3
**entered (1)**
58:19
**Enterprises (24)**
31:22;37:3,20;38:11;
39:13,17;40:7;48:19,
20;51:5,10;52:25;
54:17;55:18,18;61:17,
18;63:4,7,8;65:24,25;
74:5,6
**entertain (1)**
86:21
**entertainer (7)**
37:2;50:21;59:1;
61:6;71:6;73:1;83:21
**entertainers (48)**
4:21;15:2;29:16;
30:5;33:20;34:8;40:20,

80:7,22;81:5,15;83:12;
84:6,9;87:5,17,21;
88:18,24;89:4;92:1,12,
14;96:13;97:11;99:3,
17,19;100:7;101:5,10,
13,16;103:2,5
**duly (1)**
4:10
**duties (1)**
43:17

20,25;41:23;43:5;
44:10,13,18,19;56:12;
57:6;58:7,15;65:17;
73:12,14;76:18;81:2,
13,20,25;82:20;84:11,
13,25;85:9;86:2;87:1,
12;88:20;89:6,20;90:2,
12,18;91:7;93:4,10;
96:14;100:2,10,19
**entertainer's (1)**
83:25
**entertaining (1)**
71:5
**entertainment (17)**
5:4,22;6:3,14;23:24;
24:12,13,21;25:7;27:1,
10;44:17;54:25;60:5;
70:23;87:11;90:7
**entities (5)**
21:1;50:2,17;53:13;
56:13
**entitled (2)**
21:9;78:17
**Espinoza (2)**
55:17;59:11
**essence (1)**
33:19
**establishments (1)**
5:22
**et (4)**
4:4,5,5,6
**even (7)**
11:25;14:12;41:14;
69:18;74:25;90:9;
98:10
**event (2)**
95:3,10
**everyone (1)**
55:3
**exact (1)**
21:13
**EXAMINATION (2)**
4:12;101:14
**examined (1)**
4:10
**examining (1)**
32:2
**Excuse (4)**
55:23;92:8;101:16;
102:10
**excused (1)**
103:4
**exercise (4)**
17:25;35:6;97:22,23
**exist (1)**
71:3
**existed (1)**
28:1
**existing (1)**
27:11
**exists (2)**
39:8,10
**expect (2)**

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

47:9;98:19
**expecting (1)**
79:25
**explain (2)**
80:8;94:8
**extent (1)**
79:19

## F

**fact (6)**
57:13;82:3;83:24;
84:10;97:1;101:24
**factual (3)**
81:24;82:7,16
**fair (5)**
6:2;17:15;65:20;
73:24;75:16
**faith (1)**
78:19
**familiar (3)**
37:5,9;65:6
**Family (3)**
56:6;74:6;102:2
**far (9)**
19:19;22:8;26:13;
53:14;83:15,17,18;
86:13;98:1
**father (22)**
5:23,24,25;6:3;8:24;
15:18;25:12,16;27:8;
28:14;30:1,2;32:23;
36:11,14;38:23;85:1,
16;90:3,25;98:16;
102:8
**father's (4)**
8:15;35:17;98:9,11
**February (1)**
76:2
**federal (2)**
7:11,22
**feel (4)**
50:14;81:3,4,7
**feeling (2)**
93:17,19
**fees (2)**
63:1;72:11
**few (2)**
6:9;101:12
**filed (14)**
27:2;48:18;50:1;
54:19;56:9;59:11;62:9,
11;63:16;64:22;66:24;
71:7;75:22;77:4
**filing (1)**
50:23
**final (1)**
42:21
**financial (12)**
12:11,16,16;13:2,5,
14,15,16,19,22;14:1;
19:8
**find (1)**

51:13
**fine (11)**
19:25;21:18;23:8,12,
21;38:10;57:20,22,25;
58:2;70:3
**finish (9)**
36:16;38:6;65:11;
85:21,25;86:23;93:16;
95:9;99:18
**finished (1)**
56:4
**first (6)**
4:9,16;14:7,18;38:8;
39:6
**five (2)**
49:23;102:17
**Florida (15)**
5:9,17;6:10;8:3,4;
60:8,9;62:1;69:2,3,10,
24;70:7;71:14,22
**FLSA (35)**
41:6,7,23;42:11,12,
19,20;43:4;44:9,18;
46:6;49:5;50:3,14,23;
52:2;54:20;55:1;56:9;
58:11;59:3,6;61:7;
62:18;64:14;67:3,7;
68:23;70:6;71:11;
72:24;76:18;84:20;
91:22;92:16
**Fly (7)**
5:12;55:19;59:13,14;
65:25;69:14;74:6
**folks (1)**
82:5
**follow (1)**
43:18
**follows (5)**
4:11;42:8,24;44:4;
46:4
**food (2)**
6:16,18
**force (1)**
47:4
**form (25)**
7:13,24;12:12;19:16,
23;27:13;40:17;41:17,
24;57:7;58:21;67:14;
75:10;76:22;77:10;
80:17;84:3;87:2,13;
88:22;89:3;91:23;97:8;
98:25;100:4
**former (3)**
4:21;29:16;50:21
**Fort (1)**
5:23
**forth (1)**
72:2
**forward (2)**
95:4,10
**four (4)**
49:23;102:7,13,17
**frequently (1)**

102:19
**front (1)**
64:24
**FUCHS (104)**
7:13,24;12:12;19:15,
25;20:23;21:5,11,17,
22;22:7,14,17,19,22;
23:2,8,21;24:1,7;
27:13;28:18;30:17;
36:10,13,19;39:11;
40:17;41:17,24;45:3,9,
13,17;47:17,20;48:2,
12;49:8;50:10;51:23;
52:3,10,16;54:9;56:17;
57:7,11,14,17,20,22,
25;58:4,8,12,16,21;
63:22;65:14;66:6;
67:14;68:13;70:1,9,15,
17;74:10,18,21;75:3,8,
10;76:13,22;77:10,23;
79:12,18,23,25;80:17;
81:8;83:10;84:3;87:2,
13,19;88:12,15,22;
89:3;91:23;92:10;96:9;
97:8;98:25;99:16;
100:4;101:8,12,15;
103:1,3
**full (2)**
4:14;7:16
**further (1)**
72:4

## G

**Galardi (57)**
4:3,8,15,16;21:1;
22:9;31:22;37:3,19;
38:2,2,4,11;39:5,12,17,
22;40:7;44:15,23;45:2;
48:17,18,19;51:4,10;
52:25;54:17;55:17,18,
19,22;61:17,17;63:3,6,
7,10;65:24,25;66:1;
74:5,5,7;89:7,11,14;
93:24;94:12,14,19,19;
95:12;99:10,15,17;
101:16
**GALE (2)**
4:8,15
**Gardner (3)**
50:21;52:18;54:18
**gave (7)**
35:25;36:13;53:5;
57:5,13;65:16;72:18
**Gentleman's (1)**
51:16
**gentlemen (1)**
71:25
**George (1)**
23:20
**Georgia (8)**
15:11,13;24:16,18;
26:13;37:8;68:25;82:5

**Gerald (2)**
71:19,21
**Geter (9)**
5:10;31:21;65:20,24;
66:21,22,22,23,23
**girls (1)**
81:1
**given (10)**
4:24;5:3;40:6,7;52:6,
7,13;53:9;65:4;70:6
**giving (2)**
83:5,6
**Glen (2)**
48:18;50:1
**goes (2)**
54:10;98:1
**Goldrush (16)**
4:22;15:22;17:17;
39:25;40:2;59:2;64:17;
88:19;89:22,23,24;
90:13,19;91:17;
100:13;102:11
**good (4)**
78:19;85:16,16;
92:18
**good-faith (5)**
78:15,19;79:16,21;
80:9
**grandchildren (2)**
101:23;102:2
**grandmother (2)**
101:21,21
**grandson (1)**
101:25
**Grayford (1)**
64:12
**Grozine (1)**
49:9
**guess (14)**
32:22;33:1,18;35:11;
48:4;61:16;63:24;
66:16;67:15;71:18;
90:21;91:3;100:22;
102:10
**guys (1)**
101:11

## H

**half (2)**
102:7,13
**handle (1)**
68:23
**handled (2)**
72:2;97:3
**handles (2)**
13:15,22
**handling (2)**
53:14,15
**Hang (1)**
79:24
**Hanson (2)**
64:15,21

**happened (2)**
31:25;85:18;91:12,
13
**happy (1)**
74:18
**Harlan (2)**
32:1;95:19
**head (1)**
88:6
**hear (3)**
38:9;84:4,4
**heard (2)**
28:3;50:25
**help (1)**
48:2
**herself (2)**
64:15;67:24
**hire (6)**
12:4,9,9;49:22;82:1,
2
**hired (5)**
51:22;56:17,25;66:5;
74:10
**hires (2)**
15:1,3
**hold (1)**
9:14
**honestly (4)**
20:3;82:10;89:18;
90:10
**hope (1)**
96:1
**Horse (3)**
69:14;70:20,22
**hour (13)**
27:2,11;29:12;37:3;
40:3,14;48:23;88:5,9,
14,21;89:1,6
**hourly (3)**
33:13;49:7;85:9
**Howard (1)**
71:23
**Huh-uh (1)**
99:5
**hundred (8)**
9:1;15:24;18:1;20:7;
21:25;26:14,21;68:8
**hurt (1)**
17:9

## I

**idea (3)**
8:25;32:20;64:7
**imagine (1)**
16:14
**imparted (1)**
78:1
**implemented (1)**
95:14
**important (5)**
67:12,20,21;77:16,
17

Case 1:17-cv-00462-WSD   Document 18-2   Filed 05/30/17   Page 33 of 37

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

**inappropriate (1)**
19:24
**Inc (102)**
4:5,6;8:20,22,23;9:2,
5,21,21,23,25;10:4,9,
17;14:4;15:11,21,25;
16:8,9,12,21;17:1,11;
18:8,24;19:4,11,14,17;
20:2,5,6,9,14,15,20;
21:10,21;22:6,13,21,
25;24:25;25:4;26:13,
13;27:23;31:22;36:11,
20;37:7,7,10,20;38:12;
39:13,18;48:19,19,20;
50:22;51:5,5,10,15;
52:18,25;53:1,5;54:17,
18,19;55:18,19,19,20;
59:2;60:3,14;61:17,18;
63:4,7,8,9;64:16,17;
65:3,4,9,15,25,25;66:1;
68:1,10,14;69:14;
75:17,23;76:1
**independent (31)**
30:6,10;33:14,22;
35:3,18;41:1;49:4;
58:20;72:13;81:1,25;
82:19;83:1,3,14;84:1,
14,25;85:6;86:2,11;
88:1;89:23;90:20,22,
24;91:6,9;96:4,15
**indicates (1)**
63:15
**individual (4)**
61:11;92:6;94:16,20
**individually (4)**
61:12;63:10;68:4;
69:15
**industry (7)**
79:15;80:11,13;
81:12,13;82:9;83:13
**information (1)**
70:11
**informed (4)**
40:23;41:21;43:2;
44:7
**inherit (1)**
39:1
**inherited (20)**
5:22;6:6;8:15;9:12;
15:16;25:11,13,15;
26:25;27:6,9,22;28:6;
29:11,23;31:1;44:16;
85:4;90:6;98:14
**instituted (1)**
92:24
**instruct (6)**
19:19;21:15;22:9;
23:6,19;58:3
**interest (27)**
6:6,8;16:9;12;15:10,
15;19:13;20:23;23;
24:15;25:9,16,20;
26:25;27:9,22;28:6;

29:11,23;31:1;39:1;
40:16;41:22;43:4;44:9,
16;60:2;85:4
**into (7)**
20:18;21:9,15;26:9;
30:24;35:16;70:10
**invades (1)**
57:10
**Investment (1)**
56:4
**involve (3)**
18:3;19:16;66:14
**involved (9)**
5:8,15;12:1;21:2;
40:21;41:2;73:9;96:21;
98:11
**irrespective (1)**
95:13
**issue (6)**
23:11,12;35:2,19;
54:4;88:20
**issues (2)**
53:16;66:14

---

## J

**Jack (1)**
55:22
**January (3)**
28:15,23;75:15
**Jeff (1)**
14:21
**JEG (2)**
56:6;74:6
**Jennifer (3)**
61:4,4;65:9
**Jessica (1)**
75:15
**job (5)**
43:6,16;92:18;
101:17,20
**John (1)**
66:1
**joined (1)**
49:2
**Judge (4)**
41:14;64:12;65:1;
85:22
**justified (1)**
83:2
**justifying (1)**
83:4

---

## K

**Kap (17)**
10:14;11:16,17;12:6;
13:13,17;14:3,10,14;
18:25;53:20;54:13;
55:6,9,20;68:4;102:20
**keep (1)**
46:9
**keeps (2)**

16:16;97:5
**Kelly (1)**
16:17
**kind (3)**
13:5;20:19;93:13
**kinds (1)**
43:17
**King (2)**
25:23;26:2
**kitchen (1)**
6:19
**knew (4)**
16:6;35:17;36:4;
69:23
**knowledge (1)**
36:19
**KOD (1)**
26:20
**Kodrenyc (1)**
55:21
**Kuykendall (1)**
76:1

---

## L

**Labor (3)**
65:20;73:24;75:16
**Las (5)**
7:7;24:20;26:10;
76:17;82:3
**last (3)**
37:2;59:1;79:9
**later (1)**
23:7
**latitude (2)**
19:18;23:17
**Latoya (1)**
4:5
**Lauderdale (1)**
5:24
**Lauren (1)**
4:4
**law (3)**
7:12,22;43:18
**lawsuit (50)**
27:18,23;28:1,7,8;
29:2,4,10,16,22;30:3,
24;31:8,10,18;32:6;
37:1,12;48:18;50:20;
53:2,6;55:16;58:25;
61:7;62:9,11,19;63:2,6,
13,18;64:20,22;65:8,
19,22;66:3,11,24;69:8;
71:7;72:22;73:3,21;
74:3;75:4,14,22,25
**lawsuits (5)**
33:3;53:17;59:6;
85:9;91:5
**lawyer (7)**
72:10;77:1;78:5,9,
11,12;84:22
**lawyers (3)**
57:2;72:5;85:8

**lead (2)**
70:25;71:4
**learned (1)**
32:5
**learning (1)**
48:4
**legal (26)**
36:13,19;47:5;49:12,
14,20;52:5;62:3;63:1;
64:1;65:4,16;66:10;
72:4;76:20,25;77:8;
78:1,4;79:19,20;98:22;
99:7,21;100:25
**Lemon (2)**
37:2;39:21
**less (1)**
102:24
**level (1)**
55:12
**licenses (1)**
82:4
**licensing (1)**
10:20
**limited (1)**
23:14
**liquidated (1)**
78:18
**listed (1)**
51:7
**listen (2)**
47:21;99:16
**litigation (2)**
36:17;73:19
**little (1)**
19:18
**live (1)**
89:13
**lived (1)**
82:14
**living (1)**
5:20
**LLC (4)**
55:21,21,21,23
**Local (2)**
69:3,5
**long (10)**
35:13;38:7;45:9;
46:13,16;49:25;82:14,
15;85:3;98:10
**longer (1)**
25:16
**look (3)**
16:13,15;102:18
**looking (1)**
48:7
**looks (1)**
69:20
**lot (16)**
17:9;21:19;56:1;
60:16;62:5;72:9,10,10;
82:10,25;85:8;86:16;
87:24,25;88:3;101:23
**Lounge (1)**

7:7
**Low (7)**
5:12;55:19;59:13,14;
66:1;69:14;74:6
**Luna (1)**
60:17
**LVA (1)**
55:20

---

## M

**Mainly (2)**
73:7,8
**makes (1)**
12:11
**making (1)**
54:24;55:2;72:5,7
**male (1)**
70:22
**man (1)**
85:17
**manage (1)**
10:11
**Management (1)**
55:20
**manager (14)**
11:17,20;12:7;13:13,
17;14:4,5,5,10,16,16;
15:7,8;19:3
**managers (6)**
10:15;12:9,9;14:13;
15:9;55:6
**many (4)**
5:3;7:1;93:17;
102:10
**March (2)**
31:23;61:8
**Marco (2)**
71:7;72:3
**Masters (6)**
25:3;50:23;51:16;
52:16;54:20;68:3
**Matlow (8)**
56:18;61:23,25;62:2,
3;66:5;69:21;70:6
**matter (17)**
40:8;49:10;56:20;
62:15;63:23;64:2;65:5;
66:8;68:14,23;72:1;
73:17;78:4;82:3;94:25;
97:1;101:24
**matters (1)**
102:20
**may (9)**
11:23;12:9;38:24;
52:5,5;59:8;65:21;
92:20;100:22
**maybe (3)**
62:6;71:4;102:17
**MBJG (3)**
55:25;56:4;74:6
**mean (11)**
10:23;11:2,4,23;

Case 1:17-cv-00462-WSD   Document 18-2   Filed 05/30/17   Page 34 of 37

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

13:25;14:7;53:15;59:9;
68:12;85:20;100:25
**meaning (1)**
58:10;95:5,12
**meaningless (1)**
51:12
**means (3)**
11:22,23;12:13
**mediations (1)**
64:12
**meeting (1)**
42:18
**Melissa (1)**
72:23
**members (1)**
102:3
**mentioned (1)**
72:17
**Mia (9)**
60:3,14,17,17;61:8;
62:18;71:8,13;72:23
**Miami (3)**
25:23;26:2,20
**Michael (1)**
55:19
**Mickle (1)**
59:1
**might (1)**
73:10
**Mike (20)**
4:20;10:14;11:16,17;
12:6;13:13,17;14:3,10,
14;15:1,5,9;18:25;
19:3;53:20;55:6,9;
68:4;102:20
**Miller (5)**
32:1;33:10;35:14;
93:8;95:19
**million (1)**
31:3
**mine (1)**
59:22
**Minervini (1)**
61:7
**minimum (14)**
7:16,20;8:8,12;
30:16;33:21;49:3;
58:15;86:14,16;87:1,
12,23;88:4
**misclassified (3)**
30:6,10;49:4
**mispronounce (1)**
9:22
**misstated (1)**
77:11
**Mm-hm (5)**
5:13;14:2;51:3;
60:13,21
**money (12)**
17:9;72:5,7,9,10;
81:21;82:25;86:17,18;
87:24;88:1,3
**moneys (1)**

89:21
**months (3)**
59:18,18;75:19
**more (12)**
13:8,11;24:9;43:14,
23;44:2;50:4;55:23;
56:3;62:14;82:11;83:6
**mother (1)**
101:21
**move (2)**
95:4,10
**Mrs (2)**
44:15;50:21
**much (3)**
45:7;78:14;89:5
**Murphey (6)**
39:12;49:9;51:23,24;
56:17;66:6
**must (1)**
37:22
**myself (1)**
18:3

**N**

**name (25)**
4:14,16,19;11:10;
37:2;38:3;50:25;59:1;
63:19,25;64:19,21;
65:10;68:11,16,19;
69:12;74:14,25;75:5,7,
12;76:5,6,10
**named (13)**
8:24;27:24;37:2;
56:23;61:6,12,18;63:3,
6;64:4;71:16;74:2,4
**names (7)**
14:7,8,18,20;51:11,
13;74:9
**need (5)**
13:3;20:24;21:20;
77:19;92:8
**negative (1)**
99:5
**Nevada (3)**
7:10,16,19
**new (1)**
85:10
**night (3)**
14:16,24;15:7
**nightclub (1)**
6:10
**nightclubs (2)**
8:16,17
**Nitty (1)**
55:22
**nods (1)**
88:6
**None (3)**
53:23;88:19;91:11
**nonresponsiveness (1)**
43:20
**Northeast (1)**

10:8
**notified (2)**
40:3;63:17
**November (1)**
48:21
**number (6)**
4:21;6:3;8:16;53:12;
73:3;102:15

**O**

**oath (3)**
4:23;35:25;45:24
**object (8)**
19:15,22;22:7,8;
23:5;43:19;70:9;79:18
**objecting (1)**
43:8
**Objection (36)**
7:13,24;12:12;19:24;
20:24;23:2;27:13;
28:18;30:17;40:17;
41:17,24;52:4;54:9;
57:7;58:21;67:14;
75:10;76:22;77:10,23;
78:2;79:12;80:1,2,17;
84:3;87:2,13,19;88:22;
89:3;91:23;97:8;98:25;
100:4
**obligation (1)**
8:6
**Obviously (1)**
45:5
**October (2)**
72:23;73:22
**off (4)**
42:6;70:2;74:12;
84:8
**office (2)**
10:6,7
**officer (17)**
9:7;13:15,17,20;
14:1;16:19;19:8;22:21;
26:15,18,22,23;37:6;
38:16;60:22;61:1;
87:10
**officers (1)**
16:23
**offices (1)**
9:14
**often (2)**
16:15;102:4
**once (6)**
31:1;43:14;62:6;
72:4;85:4;102:21
**one (43)**
4:17,18,19;5:10,14,
16;8:17;13:9;14:22;
17:6;22:14,16;24:15,
25;25:19;27:21;28:9,
12;29:5,6,8;35:19;
36:6;42:5;43:23;44:2;
48:24;49:22;52:14,19;

55:23;56:1,3;59:14;
62:14;64:3;66:20;67:6;
75:18;86:6;95:5,11;
101:6
**ones (9)**
23:24;24:4,17;25:8,
11,22;26:9,20;53:22
**ongoing (1)**
29:10
**only (2)**
18:21;30:23
**Onyx (11)**
24:23,24;27:3;29:17;
31:18;32:6;35:2;40:15;
48:5;63:9,20
**open (1)**
69:18
**operate (4)**
11:6;51:18;83:5;
97:15
**operated (1)**
8:20
**operates (2)**
11:8;89:18
**operating (4)**
50:22;54:20;86:9,10
**operational (1)**
102:20
**operations (13)**
10:21;11:17,19,21;
12:7;13:13,16,18;14:4;
18:3;19:3;55:5;80:21
**opinion (5)**
34:15;45:5;81:4;
83:5,7
**opportunity (1)**
80:14
**order (1)**
58:18
**others (7)**
55:17;61:7;64:15;
65:20;67:24;69:9;76:1
**otherwise (2)**
13:3;19:23
**out (6)**
27:23;31:2;51:11;
56:1;74:9;79:8
**over (6)**
32:5;33:14;36:4;
79:8;85:15;98:21
**overtime (1)**
62:24
**owed (3)**
30:16;33:5;49:5
**own (34)**
5:23;10:3;11:5,7;
20:5,6;21:25;22:5;
26:10,19;37:24;38:1,4,
11,14;39:25;51:20;
54:25;59:7,24;60:20;
63:20;68:8,11;74:8,13;
75:1;76:17;87:11;93:4;
99:21;100:18;101:19;

102:5
**owned (6)**
6:3;7:5;12:21;102:8,
9,14
**owner (20)**
5:21;9:1;15:24;18:1,
17;26:14,14,21;37:7;
40:2;87:10;91:1;96:17;
97:18;98:1,8;99:12,13,
14,20
**owns (1)**
15:21

**P**

**paid (19)**
7:19;33:21,23;58:15;
72:3,16;87:12,22,24,
25;88:3,19;90:9,10,13,
14,15,16,16
**paper (1)**
61:21
**part (5)**
78:19;79:16;80:12
**participated (1)**
64:11
**particular (3)**
17:5;48:1;55:11
**parties (1)**
61:19
**partner (1)**
71:24
**party (2)**
83:7;101:25
**pass (1)**
5:25
**passed (4)**
5:24;8:16;15:18;
98:16
**past (2)**
82:19;85:7
**path (1)**
20:25
**pause (4)**
48:15;70:4;92:13;
101:9
**pay (12)**
8:7,12;72:10;86:14,
25;87:25;89:1,5,7,14,
21;90:2
**paycheck (4)**
9:23,25;10:2;73:2
**paychecks (1)**
73:7
**paying (2)**
28:9;31:2
**payments (1)**
31:19
**Payroll (3)**
55:8;62:20,25
**pays (1)**
7:16
**pending (2)**

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

64:9;66:18

**people (3)**
12:10;85:16;97:6

**per (1)**
33:23

**percent (8)**
9:1;15:24;18:1;20:7;
21:25;26:14,21;68:8

**perhaps (1)**
38:22

**person (2)**
55:11;94:20

**personally (13)**
44:23;48:21;54:21;
56:21,23;57:1;93:6,24;
94:7;96:11,20,22;
99:11

**persons (1)**
56:13

**pertains (3)**
41:23;43:5;44:10

**phone (1)**
38:3

**Pink (32)**
4:22;5:16;8:18,20;
11:7,12,13;14:11;16:6;
17:6;24:20;25:24;26:6,
10,20;60:12,15;61:9;
64:18;71:13;75:17;
76:2,3;88:25;89:21,22,
23;90:13;18;91:17;
100:13;102:15

**place (4)**
20:23;31:19;77:23;
79:9

**places (1)**
13:4

**plaintiff (1)**
49:2

**plaintiffs (1)**
73:4

**played (1)**
53:21

**please (19)**
4:7,14;42:5,14;
43:13,22;44:1;45:1;
46:2,8;47:14;50:7;
67:18;80:18;82:21;
84:7;87:16,17;99:17

**pm (1)**
103:8

**policies (1)**
40:14

**policy (2)**
90:8;91:2

**Pompano (3)**
25:24;26:7,21

**Pony (51)**
4:22;5:16;8:18,20;
11:7,12,13;14:11;16:6;
17:7;19:14,17;20:2,5,6,
9,14,20;21:10,21;
24:20,24;25:24;26:6,

10,21;27:23;36:11,20;
37:7;48:5,19;60:12,15;
61:9;63:8;64:18;65:3;
71:13;75:17;76:2,3;
88:25;89:21,22,23;
90:13,19;91:17;
100:13;102:16

**position (2)**
9:9;35:16

**positions (1)**
85:17

**possibly (4)**
26:14,22,22;53:20

**power (17)**
18:15,17;96:23;97:1,
13,17,21,24;98:8,13,
17,22;99:4,6,12,20;
100:22

**practice (1)**
79:16

**practices (1)**
81:17

**prepared (2)**
95:25;96:4

**present (1)**
21:14

**President (13)**
9:10,11,20;16:3,10,
14;17:10;18:2;20:4,20;
22:1;94:12;97:18

**Presumably (1)**
54:12

**pretty (1)**
94:11

**previously (1)**
102:8

**primary (1)**
101:20

**prior (2)**
31:14;42:5

**privilege (1)**
70:13

**privileged (1)**
70:10

**probably (11)**
17:8;40:5;56:25;
63:24;74:12;90:21;
92:7;101:5;102:17,21,
24

**proceeding (1)**
47:5

**proceedings (4)**
48:15;70:4;92:13;
101:9

**professional (1)**
34:8

**pros (1)**
93:18

**provision (1)**
7:12

**pull (2)**
51:11,13

**pulled (3)**

55:24;56:1;74:9

**purpose (1)**
53:2

**put (2)**
78:14;85:16

---

## Q

**quite (3)**
72:5,7;101:22

**quo (1)**
85:15

---

## R

**raised (1)**
83:8

**ran (1)**
98:10

**rather (3)**
40:25;58:20;72:13

**read (29)**
30:14;35:10,14;42:4,
7,23;43:13,22;44:1,3,
20;45:1;46:1,3,7;
47:13,18,25;50:6;
67:17,19;81:5,8,10;
84:6;87:17,18;95:7,8

**reading (1)**
46:10

**realized (1)**
31:2

**really (9)**
10:21;14:6;16:9;
17:12,14;37:22;51:14;
73:11;90:11

**realm (1)**
43:16

**reason (5)**
16:7;17:5;20:13;
92:23,25

**reasons (4)**
8:25;82:24;83:1,3

**recall (13)**
5:14;39:9;48:7,9;
50:8,13;63:17;64:19,
21;67:8;69:12;72:12;
76:6

**receive (6)**
9:23,25;10:1;17:3,6,
6

**received (2)**
49:20;52:20

**receiving (1)**
62:18

**record (13)**
20:24;42:6,7,23;
44:3;45:8;46:3;67:19;
70:2;77:24;81:10;84:8;
87:18

**records (1)**
97:4

**referred (1)**

60:11

**referring (1)**
72:19

**regarding (4)**
97:2;98:23;99:8,21

**regardless (1)**
8:10

**regards (1)**
35:19

**relationship (3)**
21:10,20;49:25

**rely (3)**
76:25;77:1;78:5

**relying (21)**
76:20;77:5,9,18,20;
78:9,12,20,21;79:1,2,5,
15;80:12,16;81:12,16;
83:16,17,22,24

**remember (39)**
5:7;31:17,17,20;
32:2,4;33:9;35:13,24,
24;37:14;39:15,15;
40:5,9,10,11;49:6,13,
14,16;59:9;61:15;
63:12,14,19,24;64:3;
65:7;68:15,19,20;
74:13,25;75:5,6,12,20;
79:9

**rendering (1)**
10:4

**repeat (1)**
84:5

**repeatedly (1)**
39:20

**rephrase (1)**
18:6

**reporter (8)**
42:7,23;44:3;46:3;
47:18;67:19;81:10;
87:18

**represent (9)**
4:21;49:23,24;51:24;
56:19;66:7;74:10;75:3,
8

**representative (3)**
94:6,13,24

**represented (16)**
36:10;39:12;49:10;
61:22;62:14;63:22;
65:15;68:14,16;69:21;
71:19,23;73:16;74:15;
77:7;78:16

**representing (2)**
76:6,7

**represents (2)**
65:13;69:24

**require (2)**
93:3,10

**required (4)**
8:11;42:19;76:4;
90:19

**reserve (1)**
103:6

**respect (1)**
36:5;102:22

**responded (2)**
35:22,23

**responding (1)**
43:10

**response (9)**
35:21;47:10,12;48:4,
8;93:12,22,23;95:16

**responses (2)**
78:17;80:10

**responsibilities (6)**
11:19;17:13;19:6,10;
101:17,20

**responsible (2)**
54:24;55:2

**restaurant (3)**
10:22,24;11:8

**restaurants (3)**
10:22,23,25

**restroom (1)**
92:9

**retained (1)**
53:1

**revealing (1)**
57:15

**Rick (3)**
56:6;66:1;74:7

**right (73)**
4:20;5:1,2,18;6:14;
7:6,21;8:14,15,19;
10:25;12:19,20,22,23;
13:1;14:17;15:17;19:9;
22:12;23:7;25:6;26:6;
27:5;28:16;29:15;30:4;
31:5;32:7,8,13,14,15,
16,17,19;33:24;34:9,
23;35:20,21;36:6;
41:19;42:25;44:5,23;
45:16;48:17;51:6,16,
19,21,22;52:1,24;
56:14,16;59:25;60:1;
69:4;79:15;84:16,18;
85:10,20;86:5;87:9;
89:12;90:8;95:14,16;
98:16;100:23

**ring (1)**
69:22

**Roberts (1)**
4:4

**role (1)**
53:21

**roughly (1)**
102:7

**ruling (3)**
35:2,18;36:5;54:3,7;
58:19

**run (5)**
7:1;10:9;12:19,21,24

**running (1)**
8:7

**runs (2)**
10:24;14:10

Lauren Roberts, et al. v.
Trop., Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

## S

**safe (2)**
26:11;38:22
**salary (2)**
17:3,6
**Saloon (1)**
69:15
**same (12)**
11:23;21:13;22:16;
23:2,18;26:17;59:3;
66:14;87:19;101:18;
102:13,22
**Sametha (1)**
48:18
**Saunders (1)**
61:4
**saying (11)**
13:22;29:1;40:10;
53:9;57:9;72:12;82:18;
83:13;92:5;93:1,2
**Schulten (5)**
39:12;49:9;56:18;
66:6;68:22
**Scott (3)**
49:9;56:18;66:6
**se (1)**
33:23
**second (3)**
70:2;72:17;101:7
**secretary (3)**
9:20;16:17,18
**seek (2)**
62:3;66:10
**sell (5)**
17:21,21;18:22;26:2,
6
**sense (1)**
13:25
**September (5)**
37:4,12,14,15;63:16
**serve (1)**
6:18
**served (1)**
63:17
**service (6)**
58:11;90:13,14,15,
16;97:4
**services (1)**
10:4
**set (2)**
31:6,20
**settled (11)**
29:2,5,9,13,20;32:14,
18;62:25;64:5;66:23;
72:4
**settlement (1)**
28:10
**seven (5)**
88:4,8,13,20;89:1
**several (1)**
12:19

**sheet (3)**
63:15;65:13;69:20
**shift (5)**
14:4,13,16,16;15:7
**Showbar (1)**
64:17
**sign (4)**
90:19,21;93:4,11
**signature (1)**
103:7
**similar (1)**
26:11
**similarly (1)**
64:16
**simple (2)**
13:12;94:11
**singer (1)**
82:2
**sitting (1)**
4:20
**Sittner (1)**
67:24
**situated (1)**
64:16
**situation (1)**
23:18
**small (3)**
5:23;6:12,19
**smart (1)**
85:17
**sold (10)**
6:16;25:18,21,22,23,
23;26:20;59:16;67:2,4
**solicit (1)**
85:8
**somebody (3)**
39:6;80:20;93:19
**Somebody's (1)**
47:3
**someone (2)**
63:3;100:22
**sometime (2)**
32:18;63:18
**sometimes (1)**
102:24
**soon (1)**
32:4
**sorry (6)**
26:22;27:6;28:20,24;
70:1;84:13
**sort (1)**
53:21
**sorts (1)**
6:22
**sought (2)**
49:20;64:1
**sound (4)**
32:19;37:5,9;65:6
**Sounds (1)**
34:10
**South (38)**
22:6,17;23:1;25:3,4;
31:22;37:3,19;38:2,2,

11;39:12,17,22;40:7;
48:19,20;50:22;51:4,
10,20;52:25;53:20;
54:3,17;55:17,18;
61:17,18;63:3,6,7;
65:24,25;69:5,6;74:5,5
**Southern (1)**
69:10
**speak (2)**
101:6;102:19
**specific (5)**
13:8,11;24:9;48:7;
50:4
**specifically (1)**
93:20
**speed (2)**
33:3,5
**spelled (1)**
4:16
**spend (1)**
21:19
**staff (3)**
6:20;7:19;12:4
**stand (1)**
8:23
**Standards (3)**
65:21;73:24;75:16
**start (1)**
7:3
**started (1)**
92:16
**state (2)**
4:14;7:22
**statement (3)**
6:2;17:15;87:9
**states (2)**
69:1;101:24
**stating (1)**
80:1
**status (3)**
28:7;59:20;85:15
**Stephanie (1)**
76:1
**Stephen (5)**
49:8;56:19;65:14;
66:7;68:13
**Steve (3)**
61:4;66:1;72:21
**still (5)**
7:2;26:9;41:15;64:9;
66:17
**Story (2)**
41:14;85:22
**stray (1)**
19:18
**strike (3)**
14:9;26:1;62:2
**stuff (3)**
16:16;41:2;90:11
**submit (1)**
39:5
**substance (3)**
52:5;54:10;57:16

**sued (4)**
21:13,14;61:14;
76:18
**suit (2)**
33:20;67:23
**suits (1)**
93:17
**suppose (1)**
97:19
**sure (19)**
31:25;36:2;38:19;
41:22;43:3;44:8,17;
49:16;50:3;51:7;54:19,
24;55:2;59:12;62:17;
73:11;92:10,12;101:8
**Susan (6)**
39:12;49:9;51:23,24;
56:17;66:6
**Swear (1)**
4:7
**sworn (2)**
4:10;45:24
**system (1)**
7:8
**systems (1)**
13:16

## T

**Tail (19)**
19:14,17;20:2,5,6,9,
14,20;21:10,10,21;24:24;
27:23;36:11,20;37:7;
48:5,19;63:9;65:4
**talk (4)**
44:25;52:23;62:5;
82:5
**talked (10)**
23:25;24:17;30:21;
53:13,22;62:6,10;72:2;
77:25;93:13
**talking (19)**
12:17;13:6;22:14;
27:1,10,14,16,18,20,
21;28:8,13;29:5,6;
41:5;42:11;52:14;89:9;
100:6
**taxes (1)**
72:10
**Taylor (3)**
56:6;66:2;74:7
**telling (5)**
23:9;39:14;43:12;
63:11;75:11
**Teri (22)**
4:3,8,15;44:23;45:2;
55:19;63:10;66:1;74:7;
88:12,15;89:7,11,14;
93:24;94:12,14,19,19;
95:12;99:10,15
**terms (1)**
79:20
**Terrence (1)**

69:9
**T-E-R-R-I (1)**
4:17
**Terrific (1)**
102:4
**Terry (1)**
66:2
**testified (5)**
4:10;28:14;92:2,4,7
**testify (1)**
23:14
**testimony (3)**
31:14;35:25;94:16
**though (2)**
41:14;96:24
**thought (1)**
85:16
**three (4)**
49:22;101:24;102:1,
17
**throwing (2)**
18:20;97:16
**Tierra (1)**
73:21
**timecards (1)**
62:25
**times (3)**
102:11,15,17
**tip (6)**
7:8,12,17,23;8:9,11
**tip-outs (1)**
97:3
**today (7)**
4:25;21:15;48:24;
66:14;93:24;94:11;
98:24
**together (1)**
102:2
**Tolbin (3)**
71:19,21;72:17
**told (13)**
21:22;29:12,19;
32:15;33:12;35:10,11;
36:9;41:14;59:8;68:15;
69:23;77:18
**took (8)**
32:5;36:4;47:24;
48:4;50:18;54:18;67:9;
85:14
**Totenberg (1)**
65:1
**town (1)**
79:8
**travel (2)**
101:22,23
**treasurer (2)**
9:18;16:18
**treat (1)**
20:19
**treated (13)**
20:14;33:21,22;34:3,
4,7,13,13;40:19;81:13,
20;82:18;83:25

Case 1:17-cv-00462-WSD   Document 18-2   Filed 05/30/17   Page 37 of 37

Lauren Roberts, et al. v.
Trop, Inc., D/B/A Pink Pony, et al.

Teri Gale Galardi
March 29, 2017

treating (1)
83:2
Trenton (1)
51:23
trip (1)
102:1
TROP (26)
4:4;8:20,22,23,23;
9:2,4,21,21,23,25;10:4,
9,17;11:14,16;14:4;
16:9;20:15;26:13;
37:10;64:17;65:3;
75:17,23;76:1
true (8)
27:7;32:25;35:22;
80:15;87:9;95:17;98:1,
1
Trust (2)
56:6;74:7
truth (1)
36:1
truthful (7)
45:21,23,25;47:9,11;
98:19,20
truthfulness (1)
94:3
try (3)
33:2;45:4;80:8
trying (2)
48:2;50:10
turn (1)
93:7
twenty-five (5)
88:5,8,13,21;89:1
twenty-seven (1)
88:11
Twice (2)
102:12,24
two (12)
4:3,23;5:5,6;49:22;
59:18,18;66:13;71:25;
75:19;76:8;77:22
type (5)
13:2;21:13;26:11;
33:14;97:5
types (3)
13:3;17:19;73:8
typical (2)
75:3,8

U

ultimate (2)
17:16,20
under (10)
4:23;7:22;14:3,10,
13;35:25;49:5;58:11;
84:20;91:22
understood (13)
29:2,15;30:4;33:19;
34:10,16,20,22,25;
79:23;80:3,18;99:1
undertake (4)

41:4;42:9;50:2;
66:25
undertaken (1)
44:16
Unfortunately (2)
74:20;76:11
unless (2)
21:15;101:11
up (6)
16:16;23:19;31:20;
33:3,5;86:12
use (7)
8:4;90:23;91:6,20;
92:8;96:7;97:5
used (3)
4:3;7:17;68:21
using (1)
92:16
usually (1)
59:8
utilize (3)
7:8,23;91:17

V

vacuum (1)
89:13
various (1)
10:15
Vegas (6)
7:7;24:20;26:10;
76:17;82:3,11
vein (1)
101:18
Vernitta (1)
65:20
versus (4)
4:4,5;31:22;71:8
vice (1)
9:20
violation (7)
27:11;37:4;65:21;
71:11;72:24;73:24;
75:16
violations (2)
59:3;76:18
visit (1)
102:4
visits (3)
11:18;12:3,10

W

wage (26)
7:16,20;8:8,9,11,12;
27:2,11;29:12;30:16;
33:13,22;37:3;40:3,14;
48:23;49:3,7;58:15;
85:9;86:15,16;87:1,12,
23;88:4
wages (2)
33:23;49:5
waitress (1)

73:10
waitresses (3)
6:20,24,25
Walker (2)
69:9;70:19
wants (2)
74:19;83:21
Ward (1)
68:22
Watts (2)
71:8;72:3
way (11)
20:19;25:19;40:14;
45:16,18;46:15;47:15;
85:7;86:6,9;88:17
Wayne (5)
56:18;61:23,25;66:5;
69:21
wear (1)
82:21
week (3)
79:9;102:21,24
weighed (1)
93:18
weight (1)
97:16
What's (6)
11:10;21:17;59:20;
77:17;90:9,10
whenever (2)
95:13,13
Whitfield (4)
49:8;56:19;65:14;
66:7
who's (6)
4:20;14:3,24;39:9,
10;101:25
whose (1)
78:11
wide (1)
23:16
William (4)
39:11;49:8;56:18;
66:6
Williams (26)
10:14,16;13:20;
16:17;19:2,8;28:6;
31:4,7,10;33:2;35:1;
36:24;40:13;41:21;
43:2;44:7,12;53:18;
54:13;55:6,9,20;66:2;
95:12;102:23
Without (1)
26:9
witness (65)
4:7,9;7:15;8:1;
12:15;19:20;24:2,5,9;
27:15;40:19;42:2;43:6,
9,12,15,21,24;44:11,
21;45:2,20,24;46:6,9,
14,20,24;47:2,7,11,15;
48:9;50:8,13;52:9,11;
58:23;67:16,20;74:17,

24;75:11;76:15,24;
77:13;78:4;80:5,19;
81:6,11;87:4,15,20;
88:6,13,23;91:25;92:8;
96:11;97:10;99:2;
100:5;103:3,6
woman (1)
27:24
words (1)
101:19
work (2)
82:22;97:6
worked (1)
23:17
workers (1)
52:2
works (1)
88:17
world (2)
24:19;102:1
Wow (1)
56:7
write (1)
47:19
written (2)
90:19,23

Y

year (1)
37:11
years (6)
7:1;81:17;85:7,8;
102:7,13
young (1)
27:24

0

08 (1)
7:4

1

1.5 (1)
31:3
12:58 (1)
103:8
19th (2)
37:13,15
1st (2)
6:1;65:11

2

2011 (1)
32:18
2012 (6)
6:1;8:17;15:19;
28:15,19;29:1
2013 (9)
26:3;37:4,13,17;
48:21;50:24;69:11,17,

19
2014 (8)
26:3,4;56:9;59:3;
61:8;63:16;65:21;
71:10
2015 (7)
31:23;65:11;72:24;
73:22;74:8;75:1;93:8
2016 (1)
26:8
2017 (2)
75:15;76:3
20th (1)
72:23
22nd (3)
59:3;65:21;73:22
24th (1)
69:11
2555 (1)
10:8
25th (2)
31:23;93:8
26th (1)
75:15
2nd (1)
63:16

3

31st (1)
61:8

5

5th (2)
50:23;71:10

6

6th (1)
48:21

7

7th (1)
76:2

8

8th (1)
56:9

9

9 (1)
7:4